SOCIETY FOR GOOD WILL TO
RETARDED CHILDREN, INC.,
et al., Plaintiffs,

v.

Hugh L. CAREY et al., Defendants.

No. 78 C 1847 (JBW).

United States District Court,
E. D. New York.

Feb. 21, 1979.

Taylor R. Briggs, LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendant Thomas A. Coughlin, III.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants, by Robert S. Hammer, Asst. Atty. Gen., New York City.

Christopher A. Hansen, New York Civil Liberties Union, New York City, for Murray B. Schneps, counsel for plaintiffs.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

This is an action on behalf of residents of the Suffolk Developmental Center, a New York State institution for the mentally retarded. They seek better treatment.

Defendants move to compel plaintiffs' counsel, Murray B. Schneps, to withdraw on the ground that his membership on the Review Panel established by the court to monitor implementation of the consent decree in *NYSARC, Inc. v. Carey*, 393 F.Supp. 715 (E.D.N.Y.1975), creates an appearance of impropriety, unfairness to defendants, and is unethical. The motion must be denied. There is no good reason to deprive the parties, the courts, and the public of the assistance of this member of the bar.

### I.

In *NYSARC*, Judge Judd held that mentally retarded persons confined at Willowbrook, a State institution in Staten Island, were entitled to improved care. *See* 357 F.Supp. 752 (E.D.N.Y.1973). The parties to that litigation entered into a detailed consent decree. It established a Review Panel of seven members: two representing and chosen by the defendants; three representing and chosen by the plaintiffs; and two "neutral" experts. The Panel was given extensive power to supervise decree implementation. *See NYSARC, Inc. v. Carey*, 596 F.2d 27, 29–34 (2d Cir. 1979) (describing history of *NYSARC* litigation and implementation of consent decree). For example, it was to (1) hire staff members; (2) be provided with adequate support staff and facilities, with compensation of its members

to be charged to the State; (3) review bi-monthly reports from Willowbrook staff; (4) have access to all Willowbrook facilities and personnel; (5) conduct any necessary inquiries; (6) make, by majority vote, recommendations to defendants, with individual members free to make informal suggestions; (7) resolve, by majority vote, disputes as to decree interpretation and implementation, with such resolution having binding effect absent objection by one of the parties, in which case the court would decide the issue; (8) establish appropriate formal and informal hearing procedures in order to carry out its duties; (9) hold meetings at which all concerned parties could make suggestions; and (10) report periodically to the court. The work of the Review Panel is not yet completed; it continues to supervise implementation of the 1975 decree.

Mr. Schneps, for his daughter, a resident at Willowbrook, had been a named plaintiff in *NYSARC*. He had utilized his legal skills actively in assisting the attorneys prosecuting that action, and was designated by plaintiffs as one of their original representatives on the Panel. All parties concede that he has served and continues to serve on the Panel as an effective and vigorous advocate of the *NYSARC* plaintiffs' rights.

The litigation before this court, in which Mr. Schneps represents plaintiffs as counsel, seeks to secure for residents at the Suffolk Center the rights afforded Willowbrook residents in the *NYSARC* litigation. Plaintiffs here seek to represent a class of all Suffolk Center residents except those covered by the *NYSARC* decree. With the exception of defendant Sutherland, Acting Director of the Center, the defendants in this litigation are state officials subject to that decree; they have worked with the Panel. In addition, because some members of the Willowbrook class have apparently been transferred to the Suffolk Center in the process of decree implementation and are entitled to its protections, the Review Panel has discussed with state officials conditions at the Center affecting *NYSARC* class members.

## II.

*Governing Legal Standard*

 Motions to disqualify opposing counsel are disfavored. Disqualification has a serious and immediate adverse effect by denying the client his choice of counsel. In cases of real ethical violations, there is available comprehensive independent disciplinary machinery to deal with them. Moreover, the courts recognize that disqualification motions are often interposed for tactical reasons; even where brought in good faith, they result in delay and add to litigation costs. *See Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241 (2d Cir. 1979). In ruling on such motions, the court must "weigh . . . the needs of efficient judicial administration against the potential advantage of immediate preventive measures," *id.* at 1246. "[U]nless an attorney's conduct tends to 'taint the underlying trial' . . . by disturbing the balance of the presentations" in the ongoing litigation, the court should be "quite hesitant to disqualify an attorney." *Id.*

 As the *Nyquist* court noted, normally these dilatory motions should be granted only where: (1) an attorney's conflict of interest undermines confidence in his or her ability to fully represent a client; or (2) an attorney may be in a position to use privileged information concerning the adversary obtained through prior representation, thus giving the present client an unfair advantage. *See id.* at 1245–1246; *see also Fund of Funds, Ltd. v. Arthur Anderson & Co.,* 567 F.2d 225 (2d Cir. 1977); *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221 (7th Cir. 1978).

 The possibility that an attorney's representation in a given case may give rise to an "appearance of impropriety" is not enough to disqualify. Specific facts must point to a marked danger that the perceived evil—either prejudice to the attorney's client, or to an adversary—will result. *See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 370 F.Supp. 581 (E.D.N.Y.

1973), *aff'd,* 518 F.2d 751 (2d Cir. 1975). Where "there is no claim that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." *Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241, 1247 (2d Cir. 1979).

Only where a former government attorney seeks to represent private clients on matters for which he or she had responsibility while in public employ does dicta suggest that appearance of impropriety alone may sometimes result in attorney disqualification. *See, e. g., General Motors Corp. v. City of New York,* 501 F.2d 639, 649 (2d Cir. 1974). Disqualified attorneys "have usually been" former government prosecutors. *Handelman v. Weiss,* 368 F.Supp. 258, 262–63 (S.D.N.Y.1973). But even in this very sensitive area, where the concern is to avoid " 'the manifest possibility that . . . [a former government lawyer's] action as a public legal official might be influenced (or open to the charge that it had been influenced) by the hope of later being employed privately to *uphold* or *upset* what he had done,' " *General Motors Corp. v. City of New York, supra,* 501 F.2d at 649 (citing A.B.A. Comm. on Professional Ethics, Opinions, No. 37 (1931)) (emphasis in original), the courts have been loathe to disqualify counsel unless he or she had "substantial responsibility" for the related case or subject matter while in government employ, or unless representation would give rise to a concrete possibility of prejudice to the client, or to an adversary. *Compare General Motors Corp. v. City of New York, supra,* 501 F.2d at 651–52; *Handelman v. Weiss, supra,* 368 F.Supp. at 263–64 (attorneys disqualified), *with Woods v. Covington County Bank,* 537 F.2d 804 (5th Cir. 1976); *United States v. Standard Oil Co. (N.J.),* 136 F.Supp. 345 (S.D.N.Y.1955) (attorneys not disqualified).

■ This case presents an issue of apparent first impression: under what circumstances will an attorney who provides assistance to the courts, the parties, and the public by aiding in the management and implementation of a complex equitable decree outlining constitutionally mandated reform in a governmental institution, be disqualified from representing a client in subsequent litigation which concerns similar governmental institutions and may involve substantially identical governmental officials as defendants? Posed in this context, a disqualification motion raises concerns not present in the usual former government attorney, conflict of interest or prejudice to a litigant situation: not only must the court be sensitive to the rights of the specific parties before it, but it must also consider the effect any disqualification rule might have on the ability of the judiciary to call on attorneys as experts to aid in resolving complex systemic disputes. This latter concern surely falls, along with concern for delay in litigation, within the "needs of efficient judicial administration" that must be weighed against the possible "advantage of immediate preventive measures" in considering disqualification motions. *See Board of Education of the City of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir. 1979).

Recent years have witnessed what Professor Chayes has aptly described as the onset of "public law" litigation, requiring courts to use new techniques and to rely on ad hoc special agents and agencies. In such suits,

> [the] party structure is sprawling and amorphous, subject to change over the course of the litigation. The traditional adversary relationship is suffused and intermixed with negotiation and mediating processes at every point. The judge is the dominant figure in organizing and guiding the case, and he draws for support not only on the parties and their counsel, but on a wide range of outsiders —masters, experts, and oversight personnel. Most important, the trial judge has increasingly become the creator and manager of complex forms of ongoing relief which have widespread effects on persons not before the court and require the judge's continuing involvement in administration and implementation.

Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L.Rev. 1281, 1284 (1976).

The resulting new procedural problems and solutions are reflected in: (1) suits implementing the school desegregation mandate of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *see, e. g., Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.), *aff'd sub nom. Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1974); *enforced by* 401 F.Supp. 216 (D.Mass.), *aff'd*, 523 F.2d 917, 530 F.2d 401, 530 F.2d 431 (1st Cir. 1975), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976); *enforced by* 409 F.Supp. 1141 (D.Mass.1975), *aff'd sub nom. Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) (Boston school desegregation litigation); *see also* H. Kalodner & J. Fishman, Limits of Justice: The Courts' Role in School Desegregation (1978) (case studies); (2) suits seeking reform of state mental institutions, *see, e. g., NYSARC, Inc. v. Carey*, 357 F.Supp. 752 (E.D.N.Y.1973), 393 F.Supp. 715 (E.D.N.Y. 1975); *Wyatt v. Stickney*, 344 F.Supp. 373; 344 F.Supp. 387 (M.D.Ala.1972), *enforcing* 334 F.Supp. 1341 (M.D.Ala.1971), *aff'd in part, decision reserved in part, remanded sub nom. Wyatt v. Alderholt*, 503 F.2d 1305 (5th Cir. 1974); *see also* Note, *The Wyatt Case: Implementation of a Judicial Decree Ordering Institutional Change*, 84 Yale L.J. 1338 (1975); and (3) suits seeking reform of prison facilities, *see, e.g., Rhem v. McGrath*, 326 F.Supp. 681 (S.D.N.Y.1971); *Rhem v. Malcolm*, 371 F.Supp. 594; 377 F.Supp. 995 (S.D.N.Y.), *aff'd and remanded*, 507 F.2d 333 (2d Cir. 1974); 389 F.Supp. 964; 396 F.Supp. 1195 (S.D.N.Y.), *aff'd per curiam*, 527 F.2d 1041 (2d Cir. 1975); 432 F.Supp. 769 (S.D.N.Y.1977).

Protecting individual constitutional rights sometimes requires substantial changes in complex societal institutions. Yet courts are limited, both by their role in our constitutional system and by institutional restrictions, in their ability to make complex policy judgments, gather information and diverse views, and supervise change. *See, e.g.,* D. Horowitz, The Courts and Social Policy (1977) (discussing courts' lack of expertise as policymakers); Note, *Implementation Problems in Institutional Reform Litigation*, 91 Harv.L.Rev. 428 (1977). These problems are, to a degree, ameliorated by the fact that the constitution requires not the establishment of ideal public institutions, but only that the institutions meet minimal adequate standards.

In setting standards, and in assuring that they are implemented, the courts are required to make policy judgments in areas in which judges may have limited expertise, although their decisions may have broad-ranging impact on local government budgetary structure, and on the lives of many people:

> The conjunction of the court's broad remedial powers and the defendant's system-wide institutional violations engenders the need for a distinctive judicial role in these situations. The court responds to the default of the governmental bodies primarily responsible for the deficient institutions, and, although sitting to adjudicate the rights of individual litigants, it must also fill the broader political role of the policymaker for the defendant institution. Discharging these two obligations involves balancing the private rights of the plaintiffs and the public interest in the operation of these institutions. The resulting judicial decree often resembles a legislative or administrative act, broadly societal in outlook rather than particularistic.

*Special Project: The Remedial Process in Institutional Reform Litigation*, 78 Colum. L.Rev. 784, 791 (1978); *see also Developments in the Law—Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1227–31, 1240–50 (1977); D. Horowitz, The Courts and Social Policy (1977); H. Kalodner & J. Fishman, Limits of Justice: The Courts' Role in School Desegregation 1–24 (1978); Report to the Danforth Foundation: Education and the Courts Seminar (mimeo. 1977); *id.* (mimeo. 1978).

As a result, federal courts have—as Professor Chayes puts it—utilized a number of competency and legitimacy enhancing techniques. At the liability determination stage, for example, courts have visited the relevant institutions, *see, e. g., Lora v. Board of Education,* 456 F.Supp. 1211 (E.D.N.Y.1978); relied heavily on the testimony and assistance of experts, *see, e.g., Rhem v. Malcolm,* 371 F.Supp. 594, 599–620 (S.D.N.Y.), *aff'd and remanded,* 507 F.2d 333 (2d Cir. 1974); and utilized the liberal discovery procedures of the Federal Rules. In formulating, implementing, and monitoring complex equitable decrees, the courts have developed a "new jurisprudence of public law remedies," *Special Project: The Remedial Process in Institutional Reform Litigation,* 78 Colum.L.Rev. 784, 789 (1978). They rely not only on the parties, but also, for example, utilize special masters, *see, e. g., Morgan v. Kerrigan,* 401 F.Supp. 216 (D.Mass.), *aff'd,* 530 F.2d 401 (1st Cir. 1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976); *Hart v. Community School Board,* 383 F.Supp. 699 (E.D.N.Y. 1974), *aff'd,* 512 F.2d 37 (2d Cir. 1975); Berger, *Away From the Court House and Into the Field: The Odyssey of a Special Master,* 78 Colum.L.Rev. 707 (1978), negotiation, and input from concerned citizens, *see, e. g., Morgan v. Kerrigan, supra.*

Effective remediation may involve complex continuing problems: there will be disputes involving interpretation and modification of the decree, the necessity of monitoring compliance, and, in some cases, the need to supervise defendants' actions. Obviously, the courts have neither the capacity nor the time to personally carry out these tasks; thus, in addition to the traditional equitable device of retention of jurisdiction, *see, e. g., Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), courts often rely on a variety of administrative techniques to achieve decree compliance. Masters are used not only to gather information, but also to supervise and suggest modifications in the remedial regime. *See, e. g., E. E. O. C. v. Local 638,* 401 F.Supp. 467, 490 (S.D.N.Y.), *plan approved,* 421 F.Supp. 603 (S.D.N.Y.1975),

*modified,* 532 F.2d 821 (2d Cir. 1976), *modified order aff'd,* 565 F.2d 31 (2d Cir. 1977); *Knight v. Board of Education,* 48 F.R.D. 115, 118 (E.D.N.Y.1969) (committee to hear individual students). Monitors may be used to report on compliance. *See, e. g.,* Harris, *A Case Study of Holland v. Donelon,* in M. Harris & D. Spiller, Jr., After Decision: Implementation of Judicial Decrees in Correctional Settings 143 (1977). Administrators, who perform functions akin to administrative agencies, may be used in particularly complex situations. *See, e. g.,* Harris, *The Title VII Administrator: A Case Study in Judicial Flexibility,* 60 Corn.L.Rev. 53 (1974). Mediators or mediation panels may be created to resolve disputes regarding the contours and requirements of the decree. *See, e. g., Calhoun v. Cook,* 332 F.Supp. 804, 810 (N.D.Ga.1971), 362 F.Supp. 1249, 1252 (N.D.Ga.), *remanded,* 487 F.2d 680 (5th Cir. 1973), *aff'd,* 522 F.2d 717; 525 F.2d 1203 (5th Cir. 1975). In extreme situations, where defendants have failed to respond to court directive, receivers may be appointed to directly control the institution involved. *See, e. g., Morgan v. Kerrigan,* 409 F.Supp. 1141 (D.Mass.1975), *aff'd sub nom. Morgan v. McDonough,* 540 F.2d 527 (1st Cir. 1976), *cert. denied,* 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977). Finally, in many cases, courts have established various kinds of review and advisory committees—such as the one in *NYSARC*—often composed of representatives from both sides, and additional experts. *See, e. g., Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972), *aff'd in part, decision reserved in part, remanded sub nom. Wyatt v. Alderholt,* 503 F.2d 1305 (5th Cir. 1974) (human rights committees).

Flexibility to formulate and implement decrees in systemic reform cases is crucial to the vindication of constitutional rights. To the extent that courts have been successful in assuring constitutionally mandated change, that success is doubtless largely due to the assistance of outsiders brought in by use of the mechanisms outlined above. In addition, many of the available techniques, particularly those which involve citizen or expert monitoring panels, serve the

crucial function of creating a bridge between the court and its constituency—citizens in the community at large and state and local governments. In many instances, these bodies serve to give the decree implementation process added legitimacy, both by providing concerned parties input into the process, and by educating the public concerning the litigation. *See, e. g.,* H. Kalodner & J. Fishman, Limits of Justice: The Courts' Role in School Desegregation 1–24 (1978); *Calhoun v. Cook,* 332 F.Supp. 804, 810 (N.D.Ga.1971), 362 F.Supp. 1249, 1252 (N.D.Ga.), *remanded,* 487 F.2d 680 (5th Cir. 1973), *aff'd,* 522 F.2d 717; 525 F.2d 1203 (5th Cir. 1975); *Ellis v. Board of Public Instruction,* 423 F.2d 203 (5th Cir. 1970) (biracial citizens' committees in school desegregation litigation). Such techniques require that individuals in the private and public sectors—both members of the bar and others—be available to assist the courts without fear that their outside careers will be unduly jeopardized.

## III.

*Application of Law to Facts*

A. Alleged Bases for Disqualification.

Unfairness, real and apparent, is alleged by defendants. They claim that as a result of his service on the Panel, Mr. Schneps has had access to information regarding Willowbrook and the Suffolk Developmental Center which he would not have had as a private lawyer or member of the public. They object to dealing with Mr. Schneps simultaneously as a Panel member and as an adversary in litigation. They report fear that Mr. Schneps may seek to utilize his Panel position to force them to provide information or take other action. Conveyed is the innuendo that permitting Mr. Schneps to represent plaintiffs will inhibit defendants from open-hearted cooperation with the Panel.

Invoking Canon 9 of the Code of Professional Responsibility, "A lawyer should avoid even the appearance of professional impropriety," defendants allude to the "very special relationship [Mr. Schneps] enjoys with [the] Court and the [defendants] as a member of the Panel;" the suggestion—made explicit on the argument—is that the court will favor plaintiffs because of gratitude for his help in another litigation. Counsel, it is argued, has used his Panel position to cultivate his private practice—or so it will appear to the public. Finally, defendants suggest lack of sportsmanship in, and inimical appearance from, Mr. Schneps acting as plaintiffs' counsel here while he receives compensation from State funds for his Panel work.

B. Analysis.

■ Defendants' argument is flawed by a mistaken premise: that Mr. Schneps' role in the *NYSARC* litigation as a member of the Review Panel is analogous to that of a government attorney, or investigative-managerial employee of the State or of this court. It is not.

The closest analogy to Mr. Schneps' role in the Willowbrook case is that of an adversary representative on a tripartite arbitration panel. No one expects neutrality from such a person. No one imagines that a lawyer in that position will refrain from representing similar clients in other litigations. It is a matter of common professional knowledge that lawyers associated with employers or union members, for example, sit on such panels and then litigate against each other's clients. Fed.R.Ev.Rule 201.

■ In "tripartite arbitration . . . each party's arbitrator 'is not individually expected to be neutral.'" *Matter of Astoria Medical Group (Health Ins.),* 11 N.Y.2d 128, 134, 227 N.Y.S.2d 401, 405, 182 N.E.2d 85, 87 (1962) (Fuld, J.). *Cf., e. g.,* 9 U.S.C. § 10(b); N.Y. CPLR § 7511(b)(1)(ii). All that is required is that the arbitrator's possible bias through connections with the appointing authority be revealed. *See, e. g., Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 149, 89 S.Ct. 337, 339, 21 L.Ed.2d 301 (1968); *Sanko S.S. Co. Ltd. v. Cook Industries, Inc.,* 495 F.2d 1260 (2d Cir. 1973); *J. P. Stevens & Co. v. Rytex Corp.,* 34 N.Y.2d 123, 356 N.Y.S.2d 278, 312 N.E.2d 466 (1974). There is here no possible

claim that Mr. Schneps' position as a plaintiff in *NYSARC* and as a representative of other plaintiffs was not known to defendants.

The *NYSARC* Panel was not a body established by the State defendants as a state administrative agency; rather, it was established upon the State's default of constitutional obligations and is composed of some members selected by each side and some "neutral" members selected jointly by both sides, all subject to the approval of the court. While it was envisioned—as it has reportedly largely developed in practice— that the Panel would operate as a cohesive, cooperative entity in policing the decree, it is clear that those members of the Panel chosen by the opposing parties separately were intended to serve as advocates for their respective sides. Thus, when the *NYSARC* defendants objected to plaintiffs' designation of a Justice Department attorney, who had participated as *amicus curiae* seeking institutional reforms in the decree negotiation process, as one of their Panel representatives, Judge Judd found no ethical concern:

> [T]here is no conflict of interest and no appearance of impropriety from that fact that [the attorney] . . . took a position in support of plaintiffs' claims. . . .
>
> The Court has already appointed two Panel members employed by the State of New York . . . who were chosen by the defendants . . . . Designation of an attorney who supported the plaintiffs' position is equally proper.

*NYSARC, Inc. v. Carey,* 72 C 356, 357 (E.D. N.Y.) (unpub. Slip Op., July 3, 1975) at 2–3. *See also id.* at 3 ("The primary objective of the Review Panel should be to achieve compliance with the standards annexed to the consent judgment, through the medium of discussion, disclosure of facts, and persuasion. The Court anticipates the cooperation of the members chosen by both plaintiffs and defendants, as well as the designated experts, to this end."). If anything, Mr. Schneps' posture as a plaintiffs' advocate on the Panel is clearer than that of the *amicus* attorney, for he was a named plaintiff (for

his daughter, a Willowbrook resident) in the *NYSARC* litigation, and was elected to his position at a meeting of the *NYSARC* plaintiffs. There is no indication that, had they so desired, plaintiffs could not have designated their *NYSARC* counsel as one of their Panel representatives, who would also have been able to continue as counsel. *See, e. g., Alberti v. Sheriff,* 406 F.Supp. 649, 678 (S.D.Tex.1975) (plaintiffs' counsel appointed as ombudsman to monitor prison reform decree, and permitted to continue representing plaintiffs in the case). Mr. Schneps has appeared in the *NYSARC* litigation before the court (along with the Justice Department Panel member), representing both the *NYSARC* plaintiffs and the Panel. *See NYSARC, Inc. v. Carey,* 72C356, 357 (E.D.N.Y.) (Tr. of May 10–11, 1977). *See also NAACP v. Brennan;* 360 F.Supp. 1006 (D.D.C.1973), 8 Empl.Prac.Dec. 5696, 5700 (D.D.C.1974) (review committee composed of three representatives from each side and nonpartisan chairperson); Altman, *Implementing a Civil Rights Injunction: A Case Study of NAACP v. Brennan,* 78 Colum.L.Rev. 739, 741–42, 746– 49 (1978) (describing implementation process and noting "partisan nature of [its] structure").

Thus, even if an appearance of impropriety standing alone were sufficient ground to require disqualification of an attorney, there is no such appearance here arising from Mr. Schneps' dual status. Just as it could not reasonably have been envisioned that the United States Justice Department attorney, once having accepted Panel membership, could not act in other litigation involving mental health facilities in New York or elsewhere, reasonable concepts of professional responsibility cannot preclude a private attorney whose practice involves advocacy of exceptional children's rights from pursuing that practice because he has served on the Panel. Given the understandings surrounding the negotiation of the *NYSARC* decree and establishment of the Panel, such a rule would be unjust to the Panel member as well as to his prospective clients. Not only would it, quite possibly, unduly restrict the attorney from pur-

suit of his private practice, but it might also result in preventing plaintiffs here, and others in their position, from securing expert legal assistance.

This Court takes judicial notice of the fact that, despite the considerable interest both the Bar and society have taken recently in the problems of exceptional children, and the availability, under recent legislation, of attorneys' fees in section 1983 actions, see 42 U.S.C. § 1988 (West Supp. 1978), there are few members of the Bar qualified and committed to litigation on behalf of such children. Cf. Letter from Christopher Hansen, Esq. to the Court (November 1, 1978) (accepting temporary appointment as plaintiffs' counsel here pending decision of this motion, but indicating that New York Civil Liberties Union—counsel in NYSARC—does not have resources to undertake permanent representation). Moreover, no reason of policy or fairness should preclude the federal judiciary from securing the assistance of private or public interest attorneys with particular expertise in formulating and implementing decrees in complex systemic litigation. Members of the Bar would be hesitant to serve on Review Panels or similar bodies were such service to bar them from pursuing litigation in their areas of expertise.

Given the factual background, there is not the slightest ground to fear the appearance that Mr. Schneps has used his Panel position to cultivate a private practice. This Court cannot suppose that the other Panel members, especially given Judge Judd's decision as to the appointment of the Justice Department attorney, will be disturbed or surprised by Mr. Schneps representing plaintiffs here; there is thus no danger that the Panel's work will be disrupted. The nature of Mr. Schneps' Panel position refutes any possible appearance that he is or will be attempting to capitalize on "the very special relationship he enjoys with [the] Court and the [defendants]," whether to cultivate a private practice or otherwise.

The suggestion that this court might favor Mr. Schneps' clients is a chimera.

While it is true that the Panel is in some sense an arm of the court—and particularly of Judge Bartels', to whom the NYSARC case was assigned after Judge Judd's untimely death—the reality is that Mr. Schneps' position has always been essentially that of a partisan on behalf of the NYSARC plaintiffs. There is no reason to suppose that any of the concerned parties, or the public, have any doubt as to the ability of any judges of this court to remain completely impartial in the ongoing Suffolk Center litigation. It beggars belief to suppose that Judge Bartels' improbable sense of gratitude to Mr. Schneps would be transmitted through some strange osmosis of association to another judge of this court assigned to another litigation.

If the mere fact that an attorney served as a finger of an "arm of the court" operated to disqualify him or her from representing a client on similar matters before the same court (or, as here, before a different judge of the same court), unfairness to clients, unfairness to the attorney, and damage to the ability of the federal courts to handle systemic litigation would result in a large number of cases. Such a rule would apply beyond the Review Panel membership situation presented here; for example, masters and receivers, who act much more clearly as "arms of the court" clothed with impartiality, would be precluded from subsequent representation since the appearance of undue influence over the court would doubtless be much stronger. Cf. Morgan v. Kerrigan, 530 F.2d 401, 426 (1st Cir. 1975), cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976) ("Since masters and experts are subject to the control of the court and since there is a need to hire individuals with expertise in particular subject matters, [they] have not been held to the strict standards of impartiality that are applied to judges.").

There is no concrete danger that Mr. Schneps has or will have access to information as a Review Panel member that is either privileged as to defendants or will prejudice them in the adversarial context of this litigation. The NYSARC consent de-

cree provides that all reports submitted to the Panel be available to all parties. Consent Decree § 7(h). *NYSARC* plaintiffs' counsel as well as the defendants have had complete access to all information obtained by the Panel. It has apparently been the Panel's practice to make all information (except names of class members) available to any interested person. *See also* Consent Decree § 7(d) (Willowbrook staff to submit reports to Panel); § 7(e) (Panel staff to compile reports for Panel); § 7(f) (complete access of Panel and its staff to Willowbrook facilities); § 8(b) (Panel recommendations to be served on all parties); § 8(d) (majority of Panel may resolve disputes, subject to Court approval; resolutions to be served on all parties); § 8(h) (aggrieved or interested parties may bring disputes to Panel); § 8(i) (Panel may provide for formal and informal hearing procedures); § 8(j) (Panel to hold public meetings); § 8(k) (Panel may draw upon aid of experts in the field); § 8(1) (Panel to report periodically to Court); *NYSARC, Inc. v. Carey,* 72 C 356, 357 (E.D. N.Y.) (unpub. Slip Op., July 3, 1975) at 3 (Panel to operate through disclosure of facts).

The only possible access Mr. Schneps has had to information directly relevant to the instant case may have been developed in connection with the Panel's consideration—mandated under the *NYSARC* decree—of the rights of Willowbrook class members transferred to the Suffolk Center. But there is no indication, with regard to this limited aspect of the Panel's activities, that any information obtained—whether specific factual information, or general knowledge of the defendants' position with regard to possible changes at the Suffolk Center—was not equally available to plaintiffs' counsel in *NYSARC,* whom defendants concede may properly represent plaintiffs here. Under such circumstances, the limited Panel excursion into Suffolk Center affairs cannot serve as the basis for disqualification.

Doubtless, Mr. Schneps has gained considerable expertise, as a Panel member, both with regard to the substantive and implementation phases of exceptional children's rights litigation and with regard to the posture of the State defendants in such actions. But such expertise would be gained by any person involved as counsel in a particularly specialized area of the law or assisting a federal court in a systemic reform litigation. Attorneys for both plaintiffs and defendants in *NYSARC* undoubtedly received on-the-job training in the course of that litigation. All lawyers and judges learn by doing. This is a basis for qualification, not disqualification. *See* Report of the Committee to Consider Standards for Admission to Practice in the Federal Courts, 79 F.R.D. 187 (1979). Expertise cannot serve as the basis for disqualification.

Defendants' plea that they should not be forced to deal simultaneously with Mr. Schneps as an adversary and as a Panel member is ethereal. Essentially, he has always been their adversary.

It is hypothetically suggested that Mr. Schneps might believe that, given limited resources, he should press for a particular institutional reform on behalf of one set of plaintiffs while refraining from pressing another claim on behalf of the other. The existence of such a situation is highly speculative. Plaintiffs here have chosen Mr. Schneps as their attorney with full knowledge of his *NYSARC* role. Should such a conflict arise, this court has wide power—especially in the event a class is certified—to take action to protect plaintiffs' rights in either of the two litigations and to assure adequacy of representation. *See, e.g.,* Fed. R.Civ.P. Rule 23(a)(3), (4), (c)(4), (d). If an equitable remedy is required, the court will be able to rely not only on submissions of counsel for both sides, but also on outside experts in fashioning and implementing the decree.

A potential "whipsaw" problem, posed by defendants, is that Mr. Schneps may use his alleged power as a Panel member to threaten defendants with contempt of the *NYSARC* court in order to garner from them information in connection with this litigation. But with regard to the *NYSARC* litigation, Mr. Schneps as a Panel member

cannot act alone either to force defendants to reveal information or to take any other action, since the Panel acts officially by majority vote. *See* Consent Decree § 8(b), (d), (f). In any event, any Review Panel orders are subject, upon objection, to the review power of the *NYSARC* court. *See* Consent Decree § 8(e). This court is confident that Mr. Schneps will not be able to coerce the sovereign State of New York or its counsel. Should they feel incapable of resisting such pressure as he may generate, they may appeal to the court for protection.

 Defendants' final argument that Mr. Schneps' dual representation will result in double compensation is without merit. The court will ultimately pass on applications for attorneys' fees. Should Mr. Schneps seek compensation to which he is not entitled, this court will deny it. It will adjust any award to reflect any prior relevant compensation received by any attorney. *See* 42 U.S.C. § 1988 (West Supp. 1978) (fee awards in section 1983 cases within discretion of court).

### IV.

*Conclusion*

In the unlikely event that any of defendants' fanciful problems actually arise, this court's broad authority to supervise and control systemic reform litigation of this kind will enable it to handle them adequately, protecting the rights of all parties to this litigation. The motion to disqualify counsel is denied.

So ordered.