**UNITED STATES of America**

v.

**Russell White BROTHERS, Jr., G. Thomas Nebel, and Thomas White Brothers.**

No. 3–92–00102.

United States District Court, M.D. Tennessee, Nashville Division.

Dec. 18, 1992.

Hal McDonough, Wendy Goggin, Asst. U.S. Attys., Nashville, TN, for plaintiff.

Michael E. Terry, Nashville, TN, for defendant Russell Brothers.

Peter J. Strianse, Nashville, TN, J. Sedwick Sellers, III, Washington, DC, Larry D. Thompson, Atlanta, GA, for defendant Thomas Nebel.

William H. Jeffress, Jr., Paul F. Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, DC, Nashville, TN, for defendant Thomas Brothers.

*MEMORANDUM*

HIGGINS, District Judge.

The Court has before it the government's motion (filed September 2, 1992; Docket Entry No. 30) to disqualify attorney Peter J. Strianse; the memorandum (filed September 2, 1992; Docket Entry No. 31) in support of the motion, defendant Nebel's response (filed September 10, 1992; Docket Entry No. 32) to the government's motion; the supplemental memorandum (filed October 9, 1992; Docket Entry No. 87) in support of the defendant Nebel's response; the second supplemental memorandum (filed November 16, 1992; Docket Entry No. 148) in support of the defendant Nebel's response; and the government's response (filed November 20, 1992; Docket Entry No. 155) to the defendant Nebel's second supplemental memorandum.

For the reasons stated below, after reviewing the entire record, including the testimony given at the evidentiary hearing, the Court grants the government's motion to disqualify Mr. Strianse from representing Mr. Nebel in this matter.

## I. BACKGROUND

Peter J. Strianse was an Assistant United States Attorney in the Middle District of Tennessee from January, 1987, to June, 1989. Since leaving the United States Attorney's office, Mr. Strianse has been engaged in the private practice of law in Nashville, Tennessee. The Government has moved to disqualify Mr. Strianse from representing the defendant, G. Thomas Nebel, because of actions taken by Mr. Strianse in his capacity as an Assistant United States Attorney. The parties do not dispute Mr. Strianse's actions so much as the consequences of those actions.

### A. *The Search Warrant*

In April, 1988, federal and state authorities in Florida were investigating the alleged drug-trafficking activities of the defendant, Russell White Brothers, Jr., a Nashville resident.[1] In connection with their investigation, agents of the Drug Enforcement Administra-

---

[1]. Russell Brothers was convicted on October 24, 1988, in Florida state court on RICO, criminal conspiracy to traffic in cocaine, and cocaine trafficking charges. *See Florida v. Russell White Brothers*, No. 88–9469CF10A.

tion (DEA) and the Florida Department of Law Enforcement (FDLE) came to Nashville to search Russell Brothers' house. The agents met with Mr. Strianse [2] who prepared the affidavit and search warrant from written reports, charts, and oral information given to him by the agents.[3]

At the evidentiary hearing on the government's motion to disqualify, Mr. Strianse described the preparation as a "cut and paste" job done as a courtesy for the agents to conform their information to federal court affidavit and search warrant forms. He testified that he received no information other than that which was given to him to cut and paste. He never met the confidential informants mentioned in the affidavit, nor does he recall their identities being disclosed to him. After the search warrant was executed, he did not review the results and had no further contact with the agents. He further stated that Mr. Nebel's name never was mentioned.

Special Agent Cynthia Schultz of the DEA testified that before meeting with Mr. Strianse she met with the two unidentified confidential informants mentioned in the affidavit. She discussed the substance of her conversations with the informants with Mr. Strianse and thinks that she told him their names. In addition, she testified that when meeting with Mr. Strianse to prepare the affidavit and search warrant, she discussed what she knew about Russell Brothers' activities, that Mr. Strianse determined whether there was probable cause for a search warrant and what information to include in the search warrant.[4] After Russell Brothers' house was searched, Ms. Schultz spoke with Mr. Strianse about the documents which had been discovered; however, she did not go over the inventory item by item with him.[5] Ms. Schultz is not sure whether she mentioned Mr. Nebel's name to Mr. Strianse.

Special Agent William G. Wolfe of the FDLE testified that the written reports and charts given to Mr. Strianse contained information regarding smuggling and individuals which was not incorporated into the affidavit and search warrant. Mr. Wolfe also testified that the identity of the second confidential informant was made known to Mr. Strianse. Mr. Nebel's name was not mentioned and Mr. Wolfe did not give Mr. Strianse any information regarding Mr. Nebel.

### B. The Seizure Warrant

In June, 1988, Mr. Strianse was approached by Nashville DEA Special Agent Mark Keller about preparing a seizure warrant and affidavit for a Piper Navajo aircraft allegedly used by Russell Brothers in his drug smuggling activities. Mr. Strianse testified that this, too, was a cut and paste job in which he took the affidavit from the April search warrant, added information regarding the pedigree of the airplane, and substituted Mr. Keller for Ms. Schultz as the affiant.[6] However, he also evaluated the evidence connecting the airplane to the reports given to him by Mr. Wolfe.

When the agents went to seize the airplane, its engines, avionics, and log book were missing. The agents suspected the owner of the hangar, Robert Hancock, of secreting the missing engines, and Mr. Keller asked Mr. Strianse if Mr. Hancock could be charged with obstruction of justice. Mr. Strianse testified that he was going to charge Mr. Hancock with obstruction, but that Joe Brown, the United States Attorney, told him

2. Mr. Strianse was the Organized Crime Drug Task Force Coordinator at the United States Attorney's office, and therefore, assisted in issuing search warrants in many cases which were not assigned to him.

3. Mr. Strianse also signed the motions to seal and unseal the affidavit and search warrant and the memorandum in support of the motion to seal on behalf of the government.

4. All the information Ms. Schultz related to Mr. Strianse is memorialized in internal DEA memoranda (DEA 6's) which have been filed under seal as government Exhibit No. 4 to the evidentiary hearing on the government's motion to disqualify.

5. Included in the items found at Mr. Brothers' house were documents which referred to Mr. Nebel.

6. Here, too, Mr. Strianse signed the motion to seal the affidavit and seizure warrant on behalf of the government. These documents are still under seal, which Mr. Strianse states is an oversight on his part. He says that they should have been unsealed after the seizure warrant was executed.

not to. Mr. Brown had spoken with Charles Ray, Mr. Hancock's attorney, and had decided not to issue a complaint and warrant in return for Mr. Hancock turning over the missing items. Mr. Strianse passed this information on to Mr. Keller.

According to Mr. Strianse, that was the extent of his involvement. No long-term strategy was discussed, and he did not learn any confidential information regarding Russell Brothers. He does not recall a letter between Mr. Ray and himself memorializing the agreement not to prosecute Mr. Hancock; however, he does recall telling Mr. Ray by telephone that, although there was no current intent to prosecute Mr. Hancock, there was nothing to stop the DEA from going to the grand jury.

Mr. Keller testified that Mr. Strianse's preparation of the seizure warrant and affidavit was a cut and paste job, and that he did not give Mr. Strianse any confidential information which went into the seizure warrant. However, in the days following the attempted seizure of the airplane, Mr. Keller spoke almost daily with Mr. Strianse. DEA internal memoranda (DEA 6's) regarding the seizure of the airplane and related events were given to the United States Attorney's office.[7] These memoranda would reflect the information Mr. Keller would have given verbally to Mr. Strianse,[8] much of which is material, confidential information regarding the investigation of Russell Brothers and Mr. Hancock.

Mr. Wolfe also testified that Mr. Strianse's preparation of the seizure warrant and affidavit was mostly a cut and paste job based on the April search warrant and affidavit. However, like the earlier search warrant and

affidavit, they also were based partly on information from a confidential source named in the affidavit. The investigation into Russell Brothers was still a Florida matter in June, 1988.

It is based on these acts by Mr. Strianse in relation to the investigation of Russell Brothers that the government seeks to have him disqualified as Mr. Nebel's attorney in this matter. Briefly stated, the three defendants in this case are being prosecuted for allegedly laundering money received as a result of the defendant, Russell Brothers', drug trafficking activities.

## II. DISCUSSION

The government bases its motion to disqualify on Canon 9 and Disciplinary Rule 9–101(B) of the ABA Model Code of Professional Responsibility,[9] and the Ethics in Government Act, 18 U.S.C.App. § 207(a)(1). The Court will address the government's arguments under the ABA Code before turning its attention to the government's statutory argument.

### A. *Code of Professional Responsibility*

#### (1) Canon 9

Canon 9 states that "[a] lawyer should avoid even the appearance of professional impropriety."[10] Disciplinary Rule 9–101(B) requires that "[a] lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee."[11] The government argues that Mr. Strianse's actions meet these standards, and therefore, he must be disqualified. The defendant, Mr. Nebel, naturally disagrees.

---

7. These memoranda have been filed under seal as government's Exhibit No. 9 to the evidentiary hearing on the motion to disqualify.

8. Although the file reflects that these memoranda were sent to the United States Attorney's office while Mr. Strianse was there, and were not returned to the DEA until after Mr. Strianse resigned, Mr. Strianse has no recollection of ever seeing the memoranda.

9. The ABA Code of Professional Responsibility has been adopted by this Court. *See* Local Rule 1(e)(4).

10. "The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers.... They embody the general concepts from which ... the Disciplinary Rules are derived." Model Code of Professional Responsibility, Preliminary Statement (1983).

11. "The Disciplinary Rules ... are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." Model Code of Professional Responsibility, Preliminary Statement (1983).

■ "The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980); *Handelman v. Weiss,* 368 F.Supp. 258, 263 (S.D.N.Y.1973). "[W]hen dealing with ethical principles" such as attorney conduct, a court "cannot paint with broad strokes." *United States v. Standard Oil Co.,* 136 F.Supp. 345, 367 (S.D.N.Y.1955). Rather, it should look at the specific conduct of the attorney before it, since "the conclusion in a particular case can be reached only after painstaking analysis of the facts and precise application of precedent." *Id.*

■ While paying close attention to detail, however, a court should not lose sight of the need to balance the broad and sometimes contrasting policies involved in a motion to disqualify. "Motions to disqualify opposing counsel are disfavored. Disqualification has a serious and immediate adverse effect by denying the client his choice of counsel." *Society for Good Will to Retarded Children, Inc. v. Carey,* 466 F.Supp. 722, 724 (E.D.N.Y. 1979); *cf. United States v. Phillips,* 699 F.2d 798, 801–03 (6th Cir.1983), *overruled on other grounds, United States v. Tosh,* 733 F.2d 422 (6th Cir.1984).

■ Special considerations, both for and against disqualification, arise when a motion is interposed to disqualify a former government attorney.

> If service with the government will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in practice of the very specialty for which the government sought his service—and if that sterilization will spread to the firm with which he becomes associated—the sacrifices of entering government service will be too great for most men to make. As for those men willing to make these sacrifices, not only will they and their firms suffer a restricted practice thereafter, but clients will find it difficult to obtain counsel, particularly in those specialties and suits dealing with the government.

*Standard Oil Co.,* 136 F.Supp. at 363. On the other hand, policy considerations underlying DR 9–101(B) which militate toward disqualification include

> [t]he treachery of switching sides; the safeguarding of confidential governmental information from future use against the government; the need to discourage government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service; and the professional benefit derived from avoiding the appearance of evil.

ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342 (1975), *quoted in In re Asbestos Cases,* 514 F.Supp. 914, 920 (E.D.Va.1981).

■ With these competing policies in mind, the Court turns to the requirements of Canon 9 which prohibit a former government attorney from accepting private employment in a matter in which he had "substantial responsibility" while working for the government. According to the American Bar Association, a "substantial responsibility" is "a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342 (1975), *quoted in Kadish v. Commodity Futures Trading Comm'n,* 548 F.Supp. 1030, 1032 (N.D.Ill.1982).

However, the Court is conscious that "[t]he A.B.A. itself has recognized that the limitation on former government attorneys which is now codified in ... DR 9–101(B) 'was not intended to have the effect that its words too literally construed imply.'" ABA Comm. on Professional Ethics and Grievances, Formal Op. 26 (1930), *quoted in Woods v. Covington County Bank,* 537 F.2d 804, 812 (5th Cir. 1976). Instead, an attorney should not be disqualified unless his participation would tend to "taint the underlying trial." *W.T. Grant Co. v. Haines,* 531 F.2d 671, 678 (2d Cir.1976). In other words, "while Canon 9 does imply that there be no proof of actual wrongdoing, ... there must be at least a reasonable possibility that some specifically

identifiable impropriety did in fact occur." *Woods,* 537 F.2d at 813. A mere "appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases." *Board of Educ. of New York v. Nyquist,* 590 F.2d 1241, 1247 (2d Cir.1979); *United States v. Washington,* 797 F.2d 1461, 1466 (9th Cir.1986).[12]

■ The fatal taint which would require disqualification arises in two types of cases: (1) where an attorney's conflict of interests in violation of Canons 5 [13] and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client, or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side through prior representation, for example, in violation of Canons 4 [14] and 9, thus giving his present client an unfair advantage.

*Nyquist,* 590 F.2d at 1246 (citations omitted) (footnotes added). The second type of potential taint is claimed in this case. The government fears that Mr. Strianse obtained confidential, privileged information while acting in his capacity as an Assistant United States Attorney which will give him an unfair advantage in defending Mr. Nebel.

In a case factually similar to the present case, another district court found a former CFTC attorney had been "personally involved" within the meaning of ABA Formal Opinion 342 to the extent that he had to be disqualified from the present litigation even though his prior involvement in the matter had been quite limited. *Kadish v. Commodity Futures Trading Comm'n,* 548 F.Supp. 1030 (N.D.Ill.1982). The attorney, John Dolkart, had: (1) "prepared a 'boilerplate' complaint by 'cutting and pasting' portions of pleadings in prior CFTC cases;" (2) helped pull files (but did not read them); (3) briefly discussed in general terms "the federally recognized accountant-client privilege;" and (4) accompanied a junior staff attorney to court when she argued a motion to "hold her hand" since she was new and inexperienced. *Id.* at 1032. Although that was the extent of his involvement, the district court disqualified Mr. Dolkart because his activities "call[ed] for the kinds of judgments inherent in lawyering." *Id.* at 1033.

However, in *Woods v. Covington County Bank, supra,* the Fifth Circuit Court of Appeals did not disqualify a Navy reserve attorney who, while on active duty, had conducted a five-day investigation into an alleged securities fraud scheme aimed at returning prisoners of war. His investigation "included a day-long meeting in Miami with S.E.C. officials familiar with the ... proceeding, an examination of the files of the Deputy Attorney General of Alabama, and interviews with the president and trust officer of the defendant Covington County Bank." *Woods,* 537 F.2d at 808–09.

The district court had disqualified the attorney in *Woods* because of the resulting "appearance of professional impropriety" in violation of Ethical Consideration 9–3 of the ABA Code of Professional Responsibility.[15]

**12.** *But see General Motors Corp. v. New York,* 501 F.2d 639, 649 (2d Cir.1974); *Handelman v. Weiss,* 368 F.Supp. 258, 263–64 (S.D.N.Y.1973). The more recent trend, however, is away from disqualifying attorneys due to a mere appearance of professional impropriety. "Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judiciary. An overly broad application of Canon 9, then, would ultimately be self-defeating." *Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir. 1976).

**13.** Canon 5 states that "[a] lawyer should exercise independent professional judgment on behalf of a client."

**14.** *See* discussion *infra* part II.A.(2).

**15.** Ethical Consideration 9–3 states: "After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists." Model Code of Professional Responsibility EC 9–3 (1983).

"The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations." Model Code of Professional Responsibility, Preliminary Statement (1983).

*Id.* at 809. The Court of Appeals reversed, concluding that an appearance of impropriety was insufficient to justify disqualification. Rather, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur" *and* "the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." *Id.* at 813, 813 n. 12.

Similarly, in *United States v. Washington, supra,* the principal case relied on by both parties to this action, the district court had disqualified two former Justice Department attorneys, without holding an evidentiary hearing, finding that the resulting appearance of impropriety outweighed their client's Sixth Amendment right to counsel of his choice. *Washington,* 797 F.2d at 1464–65. One of the attorneys, Gerard J. Hinckley, allegedly had received confidential information about the defendant while working for the government. *Id.* at 1464. The other attorney, Thomas E. Kotoske, had supervised the Strike Force on which Mr. Hinckley had worked. *Id.*

The Ninth Circuit Court of Appeals disagreed with the district court, applying the same rationale announced by the Fifth Circuit in *Woods.* The Court had "grave doubts whether an appearance of impropriety would ever create a sufficiently serious threat to public confidence in the integrity of the judicial process to justify overriding Sixth Amendment rights." *Id.* at 1466. However, if Mr. "Hinckley did in fact receive in confidence information that is material to the government's case that would give him an advantage in representing Washington, concerns about the integrity of the judicial process and our adversarial system of justice could possibly outweigh Washington's Sixth Amendment interests." *Id.*[16]

The Second Circuit Court of Appeals agrees with this rationale. In *United States v. Ostrer,* 597 F.2d 337 (2d Cir.1979), the Court upheld the disqualification of a former government attorney who, while assigned to the Justice Department's Brooklyn Strike Force, personally prosecuted two men, and called another as a witness at one of their trials, who the government planned to call as witnesses at the appellant's trial. The former government attorney, Michael B. Pollack, now represents the appellant. The Court relied on both Canon 4[17] and DR 9–101(B) in affirming the disqualification. The "matter" was not exactly the same as the prior prosecutions in that the appellant had not been on trial before. However, the policy "considerations are pertinent not only where the issues involved in the lawyer's former and present representation are the same, but also where, as here, the privileged information obtained in the course of the former representation may be used to impeach or discredit important Government witnesses in a closely related matter." *Id.* at 340.

■ With these policy considerations under DR 9–101(B) in mind, the Court now turns to the specific facts of this case. There is no reason to believe that Mr. Nebel's name ever was brought to the attention of Mr. Strianse while he was an Assistant United States Attorney. Nevertheless, there is sufficient documentary and testimonial evidence linking Mr. Strianse to the investigation of Russell Brothers and Robert Hancock to justify disqualifying him from representing Mr. Nebel in this related matter. That Mr. Nebel's name never was mentioned to Mr. Strianse is not critical. What is critical is the types and amount of confidential information Mr. Strianse was exposed to,[18] the decisions he made, the likelihood that his knowledge would taint this trial, and the accompanying public suspicion of the fairness of the judicial process.

---

Unlike Disciplinary Rules, Ethical Considerations are not enforceable through disciplinary action.

**16.** Since the district court had not held an evidentiary hearing, the Court of Appeals vacated Mr. Washington's conviction and remanded the case to the district court for an evidentiary hearing on the disqualification question.

**17.** *See infra* part II.A.(2).

**18.** Including, possibly, Mr. Nebel's name which was mentioned in the documents seized from Russell Brothers' house. *See supra* note 5.

At the evidentiary hearing, DEA Special Agents Schultz and Keller testified that they met with Mr. Strianse for assistance in preparing, respectively, the affidavit and search warrant for Russell Brothers' house and the affidavit and seizure warrant for the Piper Navajo aircraft. Although both agents' memories of their specific discussions with Mr. Strianse understandably were dulled by time, they both testified that the substance of their conversations with Mr. Strianse were memorialized in internal DEA memoranda.[19] Also submitted under seal is the affidavit, with attachments, of Joe Brown,[20] the United States Attorney for this district during the relevant time period, and a July 30, 1991, letter from Robert R. Hancock to Charles R. Ray.[21]

From the testimony of agents Wolfe, Schultz and Keller,[22] and the government's exhibits, it is evident that Mr. Strianse has received confidential information which could possibly assist him in impeaching or discrediting government witnesses on cross-examination. Mr. Strianse knows the substance of the conversations between the confidential informants and Ms. Schultz, and the identity of at least one of the informants. He has insights into the investigations of Russell Brothers and Mr. Hancock. Copies of letters and internal memoranda, including the DEA 6's, were either sent to his attention or available to him. He had telephone conversations with Mr. Hancock's attorney, and discussions with Mr. Brown and DEA agents regarding whether to bring charges against Mr. Hancock. In addition, it was Mr. Strianse who decided what information to include in the affidavits and warrants, and who made the lawyer-like decision whether probable cause existed for the warrants to be presented to the Magistrate Judge.

In light of the foregoing, the Court further finds that Mr. Nebel's qualified Sixth Amendment right to counsel also "must give way [since] its vindication would create a serious risk of undermining public confidence in the integrity of our legal system." *United States v. Hobson,* 672 F.2d 825, 828 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). Because of the confidential information shared with Mr. Strianse, there is a great chance that his continued representation of Mr. Nebel would be perceived by the public as tainting the fairness of the judicial process.

Therefore, since there is both "a reasonable possibility that some specifically identifiable impropriety did in fact occur" and "the likelihood of public suspicion ... outweighs the social interests which will be served by [Mr. Strianse's] continued participation," Mr. Strianse must be disqualified. *See Woods,* 537 F.2d at 813, 813 n. 12.

### (2) Canon 4

■ Canon 4 states that "[a] lawyer should preserve the confidences and secrets of a client." This Canon applies to all attorneys, including former government attorneys. Although the government did not argue in its motion that Mr. Strianse should be disqualified for violating Canon 4, the Court has a duty, *sua sponte,* to examine Mr. Strianse's conduct in light of Canon 4.

■ The relevant test is clear. "[W]here an attorney represents a party in a matter in which the adverse party is that attorney's former client, the attorney will be disqualified if the subject matter[s] of the two representations are 'substantially related.'" *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223 (7th Cir.1978); *see also Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 235 (2d Cir.1977); *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.,* 113 F.Supp. 265, 268–69 (S.D.N.Y.1953).

[T]he determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information might have been given to the attorney in relation to the subsequent matter in which disqualification is

---

**19.** These memoranda have been filed under seal as government exhibits to the evidentiary hearing on this motion. *See supra* notes 4 and 6 and accompanying text. A transcript of agents Schultz and Keller's testimony was filed on October 26, 1992 (Docket Entry No. 126).

**20.** Government Exhibit No. 10.

**21.** Government Exhibit No. 11.

**22.** *See supra* pp. 372–374.

sought. The rule thus does not necessarily involve any inquiry into the imponderables involved in the degree of relationship between the two matters but instead involves a realistic appraisal of the possibility that confidences had been disclosed in the one matter which will be harmful to the client in the other.

... The evidence need only establish the scope of the legal representation and not the actual receipt of the allegedly relevant confidential information.

*Westinghouse*, 588 F.2d at 224.

In order to determine whether to disqualify an attorney under Canon 4, therefore, the Court must make three inquiries:

Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. Finally, it must be determined whether that information is relevant to the issues raised in the [current] litigation....

*Id.* at 225.

■ The scope of Mr. Strianse's involvement while he was an Assistant United States Attorney has been reconstructed in detail in previous sections of this memorandum. The government alleges that, "[a]s the government attorney in the search warrant process, Mr. Strianse would have had communications with government agents concerning the evidence justifying the search, including reference to confidential informants, the search itself, and the items taken pursuant to the search." Memorandum in support at 5. In addition, the government alleges that Mr. Strianse was privy to "information obtained from confidential informants about Mr. Hancock and his relationship with Mr. [Russell] Brothers which was provided to Mr. Strianse by the [DEA]." Government's response at 3. The Court finds that it is reasonable to presume that this information was given to Mr. Strianse. Indeed, based on the evidentiary hearing testimony of agents

Wolfe, Schultz and Keller, it is highly unlikely that this information was not given to Mr. Strianse.

■ The presumption that the information was given to Mr. Strianse having been established, the Court now must determine whether the information is relevant to the issues in the present action. If so, Mr. Strianse must be disqualified. "Relevance must be gauged by the violations alleged in the [Superseding Indictment] and assessment of the evidence useful in establishing those allegations." *Westinghouse*, 588 F.2d at 226. The heart of the Superseding Indictment is the laundering, through numerous corporations incorporated by Mr. Nebel and Thomas Brothers, of the proceeds of Russell Brothers' drug trafficking activities.[23] "Relevance ... must be measured against the potential avenues of proof and not against the expected." *Id.* The Court finds that a sufficient nexus exists between the confidential information regarding Russell Brothers' activities, relationships and items seized from his home and the allegations in the Superseding Indictment for the confidential information to be relevant. Mr. Strianse, therefore, must be disqualified.

### B. *Ethics in Government Act*

The government also has moved to disqualify Mr. Strianse pursuant to the Ethics in Government Act, 18 U.S.C.App. § 207(a)(1). However, the Court does not need to reach the question of Mr. Strianse's disqualification under the Act because the issue has been resolved under the Code of Professional Responsibility.

### III. CONCLUSION

For the reasons discussed above, the government's motion to disqualify Mr. Strianse from representing Mr. Nebel in this matter shall be granted.

The Court notes, however, that Mr. Strianse's disqualification from this matter does not reflect on his integrity or competence as

---

**23.** Other corporations were formed by Eric Ellul, an attorney in Gibraltar. Mr. Ellul is not named as a defendant in the present action.

380

a lawyer. Honest and competent lawyers can and do disagree on close questions regarding the interpretation of the Canons of legal ethics which are "not drawn for Holmes' 'bad man' who wants to know just how many corners he may cut without running into trouble with the law. They are drawn rather for the 'good man,' or the ethical man, as buoys to assist him in charting his professional conduct." Irving K. Kaufman, Comment, *The Former Government Attorney and the Canons of Professional Ethics,* 70 Harv.L.Rev. 657, 657 (1957).

An appropriate order shall be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the government's motion (filed September 2, 1992; Docket Entry No. 30) to disqualify attorney Peter J. Strianse is granted. Mr. Strianse is disqualified from further representing the defendant, G. Thomas Nebel, in this matter.

It is so ORDERED.