**Susan ULLRICH, Plaintiff,**

v.

**The HEARST CORPORATION, Defendant.**

**Melissa TARDIFF, Plaintiff,**

v.

**The HEARST CORPORATION, Defendant.**

**Sheila SULLIVAN, Plaintiff,**

v.

**The HEARST CORPORATION, Defendant.**

**Nos. 92 Civ. 1320(PNL), 92 Civ. 3671 (KC) and 92 Civ. 5396(JES).**

United States District Court, S.D. New York.

Nov. 16, 1992.

Certification for Interlocutory Appeal Denied Dec. 22, 1992.

Jeffrey M. Bernbach, New York City, for plaintiffs Susan Ullrich, Melissa Tardiff and Sheila Sullivan.

Proskauer Rose Goetz & Mendelsohn, New York City (Kathleen M. McKenna, Laura Davidson, of counsel), for defendant The Hearst Corp.

## OPINION AND ORDER

LEVAL, District Judge.

Defendant, The Hearst Corporation, moves to disqualify its former attorney, Jeffrey M. Bernbach, from representing three former employees of Hearst in actions accusing Hearst of various forms of illegal employment discrimination, retaliation and illegal discharge. The court finds that Mr. Bernbach's representation of these three former employees against Hearst violates Disciplinary Rule 5–108 of the New York Code of Professional Responsibility and that Mr. Bernbach must be disqualified. The issues raised in Mr. Bernbach's three new representations that are adverse to Hearst are closely related to Mr. Bernbach's earlier representation of Hearst. His representation of these plaintiffs raises a very high likelihood that he would unavoidably use confidential information imparted to him by his former client to the disadvantage of the former client. Under these circumstances an attorney may not accept a representation which is adverse to his former client.

### Background

For nearly 20 years prior to assuming the questioned representations, Mr. Bernbach represented the defendant Hearst Corporation on labor employment and personnel matters. On June 18, 1973, he joined the staff of Hearst's legal department, working on labor matters. From July 1974 through the end of 1976 he was the staff attorney principally responsible for labor and employment issues within the office of the General Counsel. He then went into private practice and became Hearst's primary outside legal counsel with

respect to labor and employment matters. In 1980 Hearst hired Francis A. McAnaney Jr. to supervise the labor and employment field in the General Counsel's office. Thereafter, Bernbach continued to represent Hearst with respect to numerous labor and employment matters. For the period 1979 to 1991, Bernbach's bills to Hearst for legal services in these matters exceeded $800,000. This work included providing Hearst's defense in numerous litigated cases, negotiating settlements of disputes and claims, and consulting with the management of Hearst so as to provide general legal advice on labor and employment.[1]

In the years leading up to the severance of the relationship in 1991, Bernbach represented Hearst in discrimination claims before the Equal Employment Opportunity Commission and the New York State Division of Human Rights; he handled numerous discrimination lawsuits in the federal courts and negotiated numerous settlements of employee discrimination claims and severance packages; in addition, he provided advice to the management of Hearst in connection with labor and employment matters, including terminations, company strategy for the defense of lawsuits arising from terminations, policies regarding leaves of absence, maternity and paternity leaves, reductions in work force, evaluation of job performance, retirement plans, leave policies, affirmative action plans, and many other employment-related issues.

In defending Hearst with respect to these various charges of discrimination, retaliation, and improper termination, Mr. Bernbach was duty bound to become familiar with Hearst's operations, policies, and procedures relating to such matters. His responsibility to consult with and advise Hearst management on such policies required him to be intimately familiar with the corporation's practices, policies and procedures.

During 1989 Bernbach began to have disagreements with Hearst concerning the terms of his retention. Hearst expressed dissatisfaction with the amount of his hourly charges. Bernbach wrote to Hearst's General Counsel, Harvey Lipton, advising that he had been asked in the recent past to assume representations adverse to Hearst and that if he ceased to represent Hearst he might well assume representations "on the other side of the table." Bernbach sought a retainer arrangement, which Hearst resisted. Later, Bernbach learned that Hearst had hired an outside attorney to handle a labor matter. On March 14, 1991, Bernbach wrote to Victor F. Ganzi, Esq., the new General Counsel for Hearst, complaining that, since he left Hearst at the end of 1976, he had "represented it on *all* labor matters in the New York City area ... [and that] [t]o the extent that Hearst retains other counsel to handle labor matters in New York City, such represents a *profound change* in [our] relationship." (Emphasis in the original.) He went on to say that notwithstanding a decrease in the volume of legal matters he had recently handled for Hearst, he had "in deference to our long-standing attorney-client relationship, declined to take on any other matters which could in any way have the potential of conflicting with Hearst's interests," making it clear that he had done so "in the belief ... that the reduced volume of business was based simply on absence of relevant matters. Had such, in fact, been the result of assigning labor matters to other outside attorneys, I certainly would not have exercised such forbearance." Bernbach closed, stating, "I can no longer exercise any restrictions on the clients I will represent simply because

---

1. Bernbach disputes whether after McAnaney's arrival he continued to be the "principal" outside attorney. He argues also that McAnaney took over most of the responsibility for such matters leaving a small scope for outside counsel. In contrast, in a letter dated March 14, 1991, Bernbach asserted that since 1976 he had represented Hearst "in all labor matters in the New York City area." It is unnecessary to quibble over the fine details and the court makes no finding on them because it is clear and undisputed that after McAnaney's arrival, Bernbach represented Hearst in numerous negotiated and litigated employment disputes and continued also to furnish general legal advice to Hearst on such matters. Whether other Hearst attorneys played a more significant role than Bernbach is of no relevance.

Hearst may choose to retain me in the future."

Shortly thereafter, Mr. Bernbach, apparently having no further active matters for Hearst, undertook the representation of a Deborah Dunbar, an advertising salesperson for Hearst's *Connoisseur* magazine against Hearst. She alleged sex discrimination and harassment on account of pregnancy. Bernbach wrote to Gilbert C. Maurer, the Chief Operating Office at Hearst stating, "You and I know based on long experience that these matters are best settled before they become the subject of protracted litigation." Hearst's General Counsel replied at once advising Bernbach that it objected to his representation of interests adverse to Hearst and asserting that the representation of Dunbar constituted a conflict of interest in violation of the Code of Professional Responsibility, DR 5–108.

On January 9, 1992, Bernbach wrote to Maurer advising that he now represented Susan Ullrich, a former sales representative in connection with her discharge by Hearst in July 1990. The letter asserted that Hearst had acted illegally and offered Hearst one week to settle Ms. Ullrich's claim before legal action would be instituted. Hearst replied that it was looking into Ullrich's allegations, but at the outset strongly objected to Bernbach's representation of Ullrich in view of clear conflict arising from his long representation of Hearst in employment matters. The letter urged that Mr. Bernbach "withdraw from your representation of Ms. Ullrich. . . ."

Bernbach then initiated Ullrich's action in New York State court alleging violation of New York's Adoptive Parents' Child Care Leave Law, N.Y. Labor L. § 201–c, retaliatory discharge and defamation. Hearst removed the case to federal court on February 24, 1992, and answered on March 9, 1992.

On March 23, 1992, Bernbach advised Hearst by letter that he represented Sheila Sullivan, a former fashion editor at *Harper's Bazaar*. He undertook to negotiate a severance package for Sullivan, asserting that the package offered to her "is woefully inadequate," and suggesting that her termination was unlawful. The next day, March 24, 1992, he wrote to Hearst on behalf of Melissa Tardiff, a former art director for *Town & Country*, alleging that her discharge constituted sex discrimination. Bernbach's letter asserted that there was an "almost complete absence of females in Hearst general management and the possibility that males are paid more than females in comparable jobs . . . ." He stated that the severance package offered to Ms. Tardiff was inadequate in the circumstances.

Bernbach then filed the actions in question on behalf of Sullivan and Tardiff. Sullivan's suit alleged a federal cause of action for age discrimination and a New York cause of action under the Human Rights law. Tardiff alleged federal claims of sex discrimination under Title VII of the 1964 Civil Rights Act and under the Equal Pay Act of 1963, and New York claims under its Human Rights Law.

Under the random system for assignment of cases in this court, Ullrich's case was assigned to this judge, Tardiff's case to Judge Conboy, and Sullivan's case to Judge Sprizzo.

In early May, Mr. Bernbach wrote the court to request a conference to complain of Hearst's failure to furnish satisfactory responses to his document demands and interrogatories. Hearst's counsel wrote to the court on May 19, 1992, advising of its intention to move to disqualify Bernbach. A conference was held on these matters, and in due course Hearst's motion was made and answered. Thereafter Hearst made similar motions in the recently filed Tardiff and Sullivan cases. By order of Judges Conboy and Sprizzo, the Tardiff and Sullivan motions were assigned to this judge to be adjudicated together with the Ullrich motion.

## Discussion

### I. *Disqualification*

■ Disciplinary Rule 5–108 of the Code of Professional Responsibility provides that without consent of a former client

"a lawyer who has represented the former client in a matter shall not ... [t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."

The most significant issue for this dispute is by what standard the court should adjudicate the question whether the representation of these plaintiffs is "substantially related" to Bernbach's prior representation of Hearst.

The Court of Appeals has cautioned that motions to disqualify counsel are not to be promiscuously granted. The Court has recognized that such motions can inflict serious harm on the party whose lawyer is disqualified. "There is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel, a right which must be balanced against a need to maintain the highest standards of the profession." *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir.1983) (*quoting Government of India v. Cook Industries*, 569 F.2d 737, 739 (2d Cir.1978)). The Court of Appeals concluded in *Government of India* that disqualification should be granted "only upon a showing that the relationship between issues in the prior and present cases is patently clear." 569 F.2d at 739–40 (internal quotations omitted).

In interpreting these precedents in *United States Football League v. National Football League*, 605 F.Supp. 1448 (S.D.N.Y.1985), Judge Leisure of this court observed that the Circuit's decisions direct a "restrained approach that focuses primarily on preserving the integrity of the trial process.... Mere appearance of impropriety will not alone serve as a sufficient basis for granting a disqualification motion." 605 F.Supp. at 1452 (internal quotations and citations omitted); *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

Bernbach suggests that he does not have confidential information of Hearst that is pertinent to his new cases and that, to the extent he possesses privileged material, he will not disclose it. Bernbach points out that Hearst has not identified any pertinent facts or confidential communications furnished to him that bear adversely on Hearst's interests in these cases. He argues that there is no prejudice to Hearst arising from his new adverse representations. In making these arguments, Bernbach misconceives the relevant standards.

Courts, and other authorities, have repeatedly considered the problem of how explicitly the objecting former client must show prejudice. The authorities are contrary to Mr. Bernbach's argument.

In *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 268–69 (S.D.N.Y.1953), Judge Weinfeld ruled that the objecting former client is not

> required to show that during [the earlier representation] it disclosed matters [to the attorney] related to the instant case. Rather I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented ... the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.... For the court to probe further and sift the confidences in fact revealed would require the disclosure of the very matters intended to be protected by the rule. It would defeat an important purpose of the rule of secrecy—to encourage clients fully and freely to make known to their attorneys all facts pertinent to their cause.

Confronting the same problem in *Government of India*, the Court of Appeals approved Judge Weinfeld's formulation and concluded, "a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case." 569 F.2d at 740.

The American Law Institute's tentative draft of the *Restatement of the Law Governing Lawyers*, § 213 asserts that "a current matter is substantially related to an earlier matter if

.    .    .    .    .

... [t]here is a substantial risk that representation of the present client will involve the use of confidential information [2] of the former client....

*Restatement*, § 213, Tentative Draft No. 4 (Apr. 10, 1991, tentatively approved subject to the discussion, May 1992). Section 213 cross-references § 111, which states that an attorney

shall not use or disclose confidential client information ... if there is a reasonable likelihood that doing so will adversely affect a material interest of the client or if the client has directed that the lawyer not use or disclose it....

*Restatement*, § 111, Tentative Draft No. 3.

As to how to adjudicate the likelihood that such confidential client information can be used adversely to the former client, the *Restatement* draft warns, in language similar to Judge Weinfeld's, against requiring the former client to identify the adverse confidential information. It asserts:

The substantial relationship test avoids requiring disclosures of confidential information by focusing upon the general features of the matters involved and inferences as to the likelihood that confi-

dences were imparted by the former client that could be used to adverse effect against that client, given the general features of the subsequent representation.

*Restatement* § 213, comment d, at 156, 158, Tentative Draft No. 4.

I conclude that the question of substantial relationship is best answered in the manner suggested by the *Restatement*—by focusing on the nature of Mr. Bernbach's prior representation and the likelihood that, in the course of it, confidences were reposed in him by Hearst that could be used adversely to Hearst in the present litigations, rather than by requiring the identification of prejudicial information given to Mr. Bernbach.[3]

For nearly 20 years Mr. Bernbach has been rendering legal advice and litigation services to Hearst in matters that are very closely related to issues arising in these three lawsuits. In relation to disputes involving claims of sex discrimination, age discrimination, maternity leave, severance packages, settlements, and many other related issues, Mr. Bernbach has had continuous access to Hearst's confidential information and confidential policies. The confidential information that Bernbach has received throughout these years is intimately involved with issues that are necessarily pertinent to the litigation of these three actions. His exploration of the merits of prior discrimination claims on Hearst's behalf has given him unquestionable access to confidential information as to whether there is evidence to support such claims and whether Hearst has made a policy of acting in retaliatory fashion, as here alleged, when complaints were asserted. These litigations also raise the question whether Hearst's dismissal of the com-

---

**2.** The draft *Restatement* defines such confidential information of the former client to include all

information about [the former] client or ... client's matter contained in oral communications, documents, or other forms of communications, other than information that is generally known, if the lawyer ... learn[ed] or c[a]me[ ] into possession of the information ... [d]uring the course of representing [the former] client....

*Restatement*, § 112, Tentative Draft No. 3 (Apr. 10, 1990, tentatively approved, May 1990).

**3.** In addition to the reasons given in the cited authorities, I add that when a client is confiding in a lawyer, the client ordinarily does not keep meticulous notes of every confidence revealed. To require the client to remember every confidence when the lawyer later turned adverse would be unfair to the client.

plaining employees was justified by the poor quality of their performance; Mr. Bernbach's lengthy and extensive prior experience advising Hearst on similar questions has given him extensive access to confidential information pertaining to the general performance levels of other employees against whom these plaintiffs would be measured. Bernbach's negotiation of severance packages and settlements on behalf of Hearst in cases of other employees raising similar claims gives him unquestionable confidential information as to how Hearst's management assesses its vulnerability on such claims. Bernbach's access to such confidential information is all the more clear when it is recognized that his representation of Hearst has not merely been in the defense of individual claims and lawsuits but has extended also to advising management on the broad areas of the very types of employment matters that are raised in these lawsuits.

It must be recognized further that the charges made by Mr. Bernbach's new clients against Hearst do not allege isolated tortious acts unconnected to continuing policies of management. It is not as if a plaintiff were suing because the driver of a Hearst delivery truck failed to stop at a stop sign or failed to signal a left turn—events which would arguably have little or no connection to past management practices on which the attorney had previously consulted. What is claimed here is that Hearst's actions towards the plaintiffs were motivated by discriminatory animus. This raises the question whether Hearst's management has harbored such discriminatory sentiments in the recent past. Statements made by Hearst executives in consultation with Mr. Bernbach during the course of his representation of Hearst on such issues could constitute powerful evidence for these plaintiffs if statements were made that gave credence to the plaintiffs' charges of discriminatory animus in Hearst's management. Information disclosed to him in confidence of past discriminatory or retaliatory animus would be highly material in the present cases. Information disclosed to him in confidence of acceptable and unacceptable past employee performance levels could be highly probative in the trial of Hearst's defenses of justification and plaintiffs' claims of pretext.

Mr. Bernbach's defense against the motion suggests a seriously mistaken view of the standards by which such issues must be judged. For example, as to the plaintiff Ullrich, he contends his new representation cannot be substantially related to the old because the suit is brought under a recent New York enactment, the New York Adoptive Parents Leave Act, and that he had no involvement in matters relating to that Act during his representation of Hearst. There are several answers. One is that Bernbach did consult at Hearst and acquire confidential information pertaining to Hearst's policies and actions on paternity and maternity leave, which is relevant to the subject of the New York act. A second is that the Ullrich lawsuit also includes a claim of retaliatory discharge; Bernbach's experience as counsel for Hearst often touched on questions whether management engaged in retaliatory discharge for claims of illegal employment practices. Furthermore, as noted above, his prior representation of Hearst would have given Bernbach access to confidential information relevant to the validity of Hearst's defense that Ullrich was discharged because of the quality of her performance and not by reason of retaliation. Finally I note that this argument has no bearing on Bernbach's representation of Tardiff and Sullivan, which raises the same type of legal claim as Mr. Bernbach defended frequently on Hearst's behalf.

Bernbach also exhibits an incorrect perception of the legal standard in suggesting that the matter should be resolved based on his assertion that he will not disclose any confidential fact that was communicated to him. The rule is not designed merely to prevent the *disclosure* of confidences by the lawyer. It concerns itself as much with the lawyer's *use* of confidential information in a manner adverse to the interests of the former client that trusted the lawyer with its confidences. *See Restatement* § 213 (Tentative Draft No. 4) ("a substan-

tial risk that representation of the present client will involve the *use* of confidential information...." (emphasis added)). Adverse use of confidential information is not limited to disclosure. It includes knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and innumerable other uses. The rule concerns itself with the unfair advantage that a lawyer can take of his former client in using adversely to that client information communicated in confidence in the course of the representation. It concerns itself also with the importance of protecting the confidential relationship between client and attorney; if clients withheld information from their lawyers out of fear that the lawyers might use the information against the client in a subsequent adverse representation, the ability of the legal profession to render valuable advice to its clients would suffer.

In any event, Mr. Bernbach has failed to make any convincing showing to the effect that he did not receive confidential information pertinent to his present representations. He argues that the vast majority of his time was spent in the handling of discrete litigated matters. Apart from the facts discussed above that those discrete litigated matters involved issues that would be pertinent in the new representations, Mr. Bernbach simply avoids the fact that the remainder of his time was spent giving consulting advice to management on wide-ranging questions in the employment area, some of which are inevitably pertinent to his present litigations.

Giving full effect to the cautionary warnings of the Court of Appeals against overly facile disqualification of a party's attorney, this court finds that Mr. Bernbach's representation of the three plaintiffs Ullrich, Sullivan, and Tardiff in their complaints against his former client Hearst presents a strong, clear likelihood that confidential information imparted to the attorney by the former client will be used against the interests of that former client, and that Disciplinary Rule 5–108 requires Mr. Bernbach's disqualification.

## II. *Waiver*

■ Mr. Bernbach also contends that Hearst should be held to have waived the right to seek his disqualification, first because it did not formally move for his disqualification during his representation of Deborah Dunbar before the New York Human Rights Commission, and second because it did not make the motion in Ullrich's case at the earliest possible moment.

From the first, Hearst promptly and repeatedly asserted to Mr. Bernbach that it insisted on his disqualification. The fact that Hearst had not formally moved for Bernbach's disqualification in the Deborah Dunbar matter has no pertinence to the subsequent cases. In the first place, Hearst did object to Bernbach's representation of Dunbar. On receiving Bernbach's letter that he was representing Dunbar, Hearst promptly responded by telling Bernbach that Hearst objected to the representation. Secondly, even if Hearst had not objected to Bernbach's representation of Dunbar, that would not affect its right to object to his representation of other adverse parties. There are many reasons why Hearst might decline to exercise its right in the Dunbar matter without waiving those rights as to subsequent adverse appearances by Bernbach. First, it may be that on the particular facts of the Dunbar controversy, Hearst did not believe that it risked significant violation of its confidences entrusted to Bernbach. Second, because the Dunbar matter was in preliminary stages before an administrative agency and was not a lawsuit seeking judgment, Hearst may have decided that there was not enough in controversy to warrant the expense and embarrassment of litigating an order of disqualification. Hearst may also have been reluctant to submit this issue to be judged by an administrative agency rather than a court. Third, it may have hoped that having received notice of its objection to the illegal representation, Mr. Bernbach would not undertake future representations that violated his ethical obligations.

Of course it is true as to certain types of rights that a failure to invoke them results

in waiver. A defendant in a criminal case cannot take the witness stand for his direct testimony and then invoke his rights against self-incrimination for cross. And there is authority to the effect that the sharing of a confidential communication with one outside the confidential relationship results in permanent waiver of the right of confidence with respect to that communication. That is because the basis for asserting the privilege is thought to have been destroyed by the inconsistent conduct in those circumstances. Conversely, allowing a neighbor to cross one's land once, or allowing children to swim in one's pond on one occasion, does not result in waiver of the owner's right to exclude them in the future.

On these facts, there is no logic to the proposition that Hearst's failure to litigate its right to bar Bernbach from representing Dunbar in the State Human Rights Commission constituted a waiver of the invocation of that right for future Bernbach representations adverse to Hearst. Mr. Bernbach cites no cases that support his argument in this respect.

There is no issue here of estoppel by reason of prejudice to third parties, such as Bernbach's new clients. The plaintiffs in these three actions did not invest in a justified expectation that Mr. Bernbach would be allowed to represent them because he had been permitted to represent Dunbar. Nor is there any unfairness to Mr. Bernbach in requiring him to adhere to his ethical obligations as to these new clients, notwithstanding having permitted him to violate them in the case of Dunbar.

In short, the argument that failure to compel his disqualification in the Dunbar case resulted in waiver of the right to compel his disqualification as to his new clients has no basis in fact, law, or logic.

■ Nor is there merit to plaintiff Ullrich's argument that Hearst lost the right to disqualify Mr. Bernbach in her case by reason of tardy invocation. Bernbach points out that before moving for his disqualification in Ullrich, Hearst removed the case from state to federal court, filed an answer, and responded to certain discovery requests, and did not raise the question of

disqualification with the court until Bernbach requested a conference to discuss discovery. The issue was raised with the court approximately four months after the institution of the action. I recognize that in some circumstances delay in raising the issue can effectively result in a waiver. If a litigant excessively and unnecessarily delays in raising the issue of disqualification, subsequent disqualification can unfairly cripple the opposing party's efforts because the disqualified attorney would have invested large amounts of time and effort that must then be re-duplicated by another attorney. This, however, is not such a case. Even before the litigation was filed, on receipt of Bernbach's letter advising of his representation of Ullrich, Hearst promptly responded that it objected. Once the litigation was instituted, there were deadlines that required the immediate attention of Hearst. It needed to remove the case promptly, failing which the right to remove would have been lost. It needed to answer in order to avoid default. It is true that Hearst might have raised the disqualification issue earlier than it did. But Hearst did not delay for so long a time as to harm plaintiff Ullrich's interests. The litigation was still in its incipient stages when Hearst advised the court it would move for Mr. Bernbach's disqualifications.

Ullrich does not contend that she has made payments to Mr. Bernbach placing her at the disadvantage of having to pay a second time to a new lawyer. (If this were the case, in all likelihood the fairest resolution would be to require Mr. Bernbach to return whatever retainers or fees he had received. Hearst objected promptly to the representation, and it should have been clear to him that, in the face of Hearst's objection, his undertaking the representation was highly questionable.) Mr. Bernbach did not seek the court's guidance or ruling, nor, so far as the record appears, did he consult with any ethics committee to seek an opinion on the matter. If Bernbach wanted to assure that his client would not be prejudiced by delay, he could have raised the question with this court at the earliest possible moments without waiting for Hearst's formal motion. Furthermore, for the reasons explained above in connec-

tion with Bernbach's representation of Dunbar, even if the court concluded that Hearst's delay in moving for Bernbach's disqualification in Ullrich's case barred it from later seeking *that* disqualification, this would not bar Hearst from its prompt assertion of the right to disqualify Bernbach in his representation of Tardiff and Sullivan.

\* \* \*

I conclude that Hearst has amply shown that Mr. Bernbach's representation of plaintiffs Ullrich, Tardiff, and Sullivan against Hearst in matters closely related to the subject of his former representation of Hearst raises a clear likelihood of misuse of confidences entrusted to him by Hearst in the attorney-client relationship. Bernbach's new representations, adverse to Hearst, are very substantially related to the subject matter of his prior representation of Hearst. I conclude that Disciplinary Rule 5–108 requires his disqualification.

### Conclusion

Defendant's motion to disqualify plaintiffs' counsel is granted. Mr. Bernbach is hereby ordered disqualified from the representation of plaintiffs Ullrich, Tardiff, and Sullivan in these actions against Hearst.

SO ORDERED.

### CERTIFICATION FOR INTERLOCUTORY APPEAL DENIED

Plaintiffs request that this court's November 13, 1992 Opinion and Order disqualifying plaintiffs' counsel be certified for immediate interlocutory appeal. An interlocutory order may be certified for appeal under 28 U.S.C. § 1292(b) if it "involves a controlling question of law as to which there is substantial ground for difference of opinion and ... an immediate appeal from the order may materially advance the ultimate termination of the litigation...." I do not believe that the order of disqualification meets this test.

Plaintiffs contend that the court decided the question of disqualification on the basis of a new standard, drawn from a tentative draft of the *Restatement of Law Governing Lawyers*, which plaintiffs assert is a "major departure" and "vastly different from that established by the Second Circuit."

Plaintiffs mischaracterize the court's ruling. The *Restatement* draft is not cited as an authority, but only as helpful explanatory commentary. In my view, the provisions of the *Restatement* draft quoted in the opinion are consistent with the law of the Circuit. Furthermore, my decision to disqualify Mr. Bernbach would have been the same, based on the authoritative rules and decisions, regardless of the existence of the *Restatement* commentary.

As noted and extensively discussed in the opinion, Mr. Bernbach has had "continuous access to Hearst's confidential information and confidential policies" as to "matters that are very closely related to issues arising in these three lawsuits." Many of the issues upon which he has received confidential information over the years are directly in dispute in these cases, such as whether Hearst's management harbors the discriminatory animus of which the plaintiffs accuse it, whether it follows a policy of retaliation against claimants, where evidence on these questions is to be found, what are the employee performance levels that management finds acceptable, and others. The opinion concludes that there is "a strong clear likelihood that confidential information imparted to the attorney by the former client will be used against the former client...."

These findings, in my view, are clearly within the disqualification standards followed by the Second Circuit. Although in my view the Circuit softened its formulation of the standard from *Government of India* in 1978 ("the issues ... were substantially the same," "essentially the same," "identical,"), 569 F.2d at 739–40, to *Evans v. Artek*, in 1983 ("a substantial relationship between the subject matter of counsel's prior representation ... and the issues in the present lawsuit,"), 715 F.2d at 791, the facts presented here would easily satisfy either formulation of the test. The relationship is "patently clear," and some of the issues that will arise in these litigations are "essentially the same" as those on which Bernbach previously represented

Hearst. *See Government of India,* 569 F.2d at 739–40. *See also United States Football League v. National Football League,* 605 F.Supp. 1448 (S.D.N.Y.1985).[1]

A standard that permitted Mr. Bernbach to change sides and use against Hearst the confidential information he received during nearly 20 years of representing it would seriously damage the confidentiality of the attorney-client relationship. I do not believe the Second Circuit's opinions countenance such a result.

In my view, Mr. Bernbach's representation of the plaintiffs against his former client presents so egregious an abuse of the confidential relationship that there is no "substantial ground for difference of opinion" on this issue. Plaintiffs have, therefore, failed to satisfy the test for an interlocutory appeal under § 1292(b).

Accordingly, the application for certification of an interlocutory appeal is denied.

SO ORDERED.

---

**1.** As to my citation of the language of the draft *Restatement,* § 213, comment d, disavowing any obligation on the former client to identify the past confidential disclosures, this position is scarcely new. It merely restates Judge Weinfeld's 1953 ruling in *T.C. Theatre,* 113 F.Supp. at 268–69, which was approved by the Court of Appeals in *Government of India,* 569 F.2d at 740.