**UNITED STATES,**

v.

**Jose ESCOBAR–OREJUELA, et al., Defendants.**

**No. 95–CR–336 (FB).**

United States District Court, E.D. New York.

Dec. 22, 1995.

Zachary W. Carter, United States Attorney by Paul Weinstein, Michele L. Adelman, Assistant United States Attorneys, Brooklyn, NY, for U.S.

Barry E. Schulman, Brooklyn, NY, for Defendant, Jose Escobar–Orejuela.

John M. Apicella, Brooklyn, NY, for Defendant, Gregorio Moreno.

Joel Cohen, New York City, for Defendant, Argemiro Caicedo.

Jay Horlick, New York City, for Defendant, Robert Caicedo.

Bernard H. Udell, Brooklyn, NY, for Defendant, Braulio San Miguel.

Paul Warburgh, Jr., New York City, for Defendant, Omar Diaz.

Steven M. Bernstein, New York City, for Defendant, Julio Bermudez.

Paul R. Rinaldo, Forest Hills, NY, for Defendant, Basilio Caicedo.

David Cooper, New York City, for Defendant, Emiro Diaz.

### MEMORANDUM AND ORDER

BLOCK, District Judge:

Presently before the Court is the Government's motion, joined in by defendant Julio Bermudez Prado ("Bermudez Prado"), to disqualify Barry E. Schulman ("Schulman") from representing defendant Jose Escobar–Orejuela ("Escobar–Orejuela") in this pending criminal prosecution. The motion is denied.

### I.

### BACKGROUND

In 1978, Schulman, while an Assistant United States Attorney ("AUSA") in the Eastern District of New York, prosecuted Escobar–Orejuela, Bermudez Prado and Jesus Lozada–Duenas ("Lozada–Duenas"), and others, for their involvement in a conspiracy to import and distribute cocaine and other illicit drugs. *See United States v. Cambindo Valencia*, 609 F.2d 603 (2d Cir.1979), *cert. denied, Prado v. United States*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980). According to the indictment, the conspiracy occurred between approximately January 1972 and October 1976. *Cambindo Valencia*, 609 F.2d at 607.

Schulman is now defending Escobar–Orejuela against new drug charges arising out of a different conspiracy to distribute cocaine. Bermudez Prado again is his co-defendant and Lozada–Duenas was a co-defendant who has pled guilty and will likely be a Government witness at trial. This new conspiracy, as set forth in the indictment, allegedly occurred "on or about and between May 1, 1994 and April 11, 1995." The Government's motion papers claim that Escobar–Orejuela headed an illegal organization, involving Bermudez Prado and Lozada–Duenas, that imported large amounts of cocaine into the United States from Columbia. (Gov't Mem. Supp. at 8 (August 23, 1995)). It plans to prove at trial that Escobar–Orejuela arranged for the importation of 180 kilograms of cocaine in a shipping container aboard a Grancolombiana ship that was to be docked at a Brooklyn pier. *Id.* The Government asserts the defendants' plan was that Escobar–Orejuela, through Lozada–Duenas, would use an "inside man" known to Lozada–Duenas, who could move the container from the ship to a fence at the pier where it could be removed by a group of unloaders. *Id.* at 8–9. Bermudez Prado allegedly acted as "lookout" during the importation scheme. *Id.* at 9.

Despite the approximately 20–year hiatus between these two criminal cases, the Government contends that it will be prejudiced if Schulman is not disqualified because he presumably obtained confidential government information relevant to the current prosecution while prosecuting the defendants in *Cambindo Valencia*. The Government states:

> While the present case is not the same investigation as *United States v. Cambindo Valencia*, and in fact the present investigation did not begin until over 15 years after the indictment in *Cambindo Valencia*, the facts of … *Cambindo Valencia* nevertheless are highly likely to be relevant at least as background to the conspiracy in this case, in regard to the cross-examination of Lozada–Duenas, and in regard to the pos-

sible cross-examination of Bermudez Prado.

*Id.* at 13.

Resolving disqualification motions where a criminal attorney is sought to be disqualified because of his or her former Government employment requires a careful balancing of a defendant's Sixth Amendment right to counsel of his or her choice with the duty of the Court to preserve the integrity of the judicial process and the Government's right to a fair trial. There is sparse case law addressing the clashing of these competing interests. In light of their importance, the Court conducted a searching fact-specific inquiry of counsel (the "Hearing") to flush out the nature and scope of these interests in the context of the prior and current prosecutions.

## II.

### THE HEARING

At the Hearing, the Government focused on "background information" that it plans to adduce at trial from Lozada–Duenas concerning his relationship with Escobar–Orejuela and Bermudez Prado, allegedly dating back to the *Cambindo Valencia* conspiracy. With respect to Lozada–Duenas' anticipated testimony, the Government stated:

Now, what I expect at trial is that when Mr. Lozado [sic] is asked, well, how did you meet Jose Escobar? How did you meet Bermudez–Prado? His answer will be, events which were investigated by Mr. Schulman as part of his case.

These defendants, Lozado [sic], Escobar, Bermudez–Prado, all met and became associates in the narcotics business during the time of Mr. Schulman's investigation. So that to understand the present conspiracy, to understand why these people, why Lozado [sic] would be trusted by Escobar, why Escobar would trust Mr. Bermudez to do business, significant narcotics business, in this case it's necessary for the jury to know how these people met each other; how they did narcotics business together; how they were in the same circle of narcotics dealers; how they came to trust each other; how they went to trial together;—

I'm not certain the government will offer this—how they sat at counsel table together; how they didn't testify against each other; how they served their time; how they trusted each other; how they became associates in this case.

(Tr. 7.) [1]

In response to the Court's questions regarding whether there was anything else, other than this background information, connecting the two prosecutions, the Government alluded to the arrest of Bermudez Prado in the current prosecution, which occurred while he was sitting in a van outside of a pier in New Jersey. (Tr. 10.) Thereafter, the following colloquy took place:

[THE COURT]: I think I understand some of your conceptual strokes here, but I want to deal with this thing on a more fact-specific situation.

[THE GOVERNMENT]: I'll try to get down to the facts that I was dealing with, before, with Mr. Bermudez outside of the pier in a van.

[THE COURT]: All right. That's one fact scenario which concerns you?

[THE GOVERNMENT]: Yes, particularly. And, here is why: A number of the other defendants had just broken into a container, had gone through a fence, broken into a container on the pier in Newark, and had removed hundreds of pounds of cocaine, and placed it into the van.

Mr. Bermudez–Prado did not go. He didn't go. He waited in the van.

Now, then the arrests occurred. The question in this case for the jury to decide is, what was Mr. Bermudez–Prado's mental state? Did he have the requisite intent?

Now, one of the main issues . . . is going to be Bermudez–Prado's relationship to the person he's sitting next to, Escobar. How did they get to know each other? What's the context? And, it is going to be drug dealing. It's not going to be poker playing or something else.

And, that relationship was formed and investigated and proved at trial by Mr.

---

**1.** Page references are to the hearing transcript (October 23, 1995).

Schulman. It's the exact evidence that he proved after [sic] the trial. He charged them both in a conspiracy. The same evidence in this case.

(Tr. 12–13.)

The Government stated that it would be "prejudiced by the cross-examination of the government's witness by somebody who had access to privileged information of the client that [the Government] represent[s]." (Tr. 17.) The Court then attempted to determine more precisely the nature of the relationship between the two prosecutions:

[THE COURT]: You keep saying this. This is conclusory. I'm trying to be fact-specific.

We seem to be at odds with each other. I understand your general argument. I'm concerned about it. Every judge who would have to reflect upon this would be concerned about it. It's the type of situation that sort of maybe falls within the broad parameters of the court's discretion. I want to make a reasoned decision to exercise my discretion in an appropriate fashion.

It's not a black-and-white situation. That's why the word "discretion" is employed, I guess. By making the broad arguments, you're not helping me to make a discrete, hopefully intelligent, balanced decision.

All I hear so far is that the whole problem stems from background information which the government wants to use, going back perhaps two decades ago. I don't see where that rises to the level of a substantial nexus, or a substantial relationship between the facts and circumstances in this case, and the subject of the prior representation of the government by Mr. Schulman....

(Tr. 17.) The Government then responded by stating that it was going to ask Lozada–Duenas how he met Escobar–Orejuela. Thereafter, the following colloquy occurred:

[THE GOVERNMENT]: That was an issue in Mr. Schulman's case.

[THE COURT]: Why is that a substantial relationship between this case and that case? What knowledge would Mr. Schulman possibly possess 20 years ago that would have some impact at all on that type of question?

[THE GOVERNMENT]: Your Honor, I don't know. I don't know. And, of course, your Honor doesn't know. Only Mr. Schulman knows.

So, if he says, no, you did not meet my client at the Tunnel Bar. In fact, you solicited him and you dragged him into the narcotics business back then. And, I'll say, I don't know that. What's the good-faith basis? We won't know. That's the problem with [*United States v. Ostrer*, 597 F.2d 337 (2d Cir.1979)]. That's the problem in this case.

It seems like there are fundamental questions that I should be able to ask a cooperating witness. When did you meet your coconspirator? What happened when you met him? What's your relationship with him? Very basic, fundamental things that need to be developed in every criminal case involving a cooperating witness, to establish how they know.

(Tr. 18–19.)

In response, Schulman stated:

Your Honor, first of all, if he asks him about how he met Mr. Escobar 20 years ago, I don't think I would have any privileged information. I have looked carefully over the old case and the old brief, which is the extent of my memory, the 32–page decision and 164 page brief, and in that, I find no interaction between Mr. Lozado [sic] and Mr. Escobar at all.

(Tr. 19.)

The Government further proffered that Lozada–Duenas would testify that prior to the *Cambindo Valencia* trial he knew Escobar–Orejuela and participated in narcotics deals with him and Bermudez Prado. (Tr. 21–22.) Schulman replied:

Once again, your Honor, it was not within the investigation that I conducted, if such activity existed, number one.

And, number two, the material that—the fact that I did not determine such a thing in an investigation hardly would be probative or relevant for cross-examination.

Whatever we would have—what [the Government] really fears, I believe, is that I'll

cross-examine him about his past history and make him look like a bad person. Well, he's going to disclose all that to me, anyway. If he didn't, I've got it in the Court of Appeals opinion and the brief. (Tr. 23.)

## III.

### DISCUSSION

**A. The Competing Interests: The Sixth Amendment v. The Integrity of the Judicial Process and the Government's Right to a Fair Trial**

In a litany of cases, the Supreme Court has long recognized the principle expressed in the seminal case of *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), that the Sixth Amendment right of counsel affords a criminal defendant with a "fair opportunity to secure counsel of his own choice." *Id.* at 53, 53 S.Ct. at 58. *See, e.g., Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *Chandler v. Fretag,* 348 U.S. 3, 9, 75 S.Ct. 1, 4, 99 L.Ed. 4 (1954); *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942).

■ However, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698. "The question of disqualification therefore implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." *United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993) (*citing Wheat,* 486 U.S. at 160, 108 S.Ct. at 1697), *cert. denied,* —— U.S. ——, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994). *See United States v. Ostrer,* 597 F.2d 337, 340 (2d Cir.1979) ("Disqualification of counsel

[where privileged information has been obtained] is rooted in notions of fundamental fairness; allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an unfair advantage.") (quotations omitted). Under proper circumstances, therefore, a defendant's Sixth Amendment right to counsel may be trumped by this competing interest. *Id.* at 341 ("A defendant's right to counsel of his choice is not an absolute one, but must give way when required by the fair and proper administration of justice.") (citations omitted).

Thus, "[i]n determining whether the right of the accused to counsel of his choosing should be honored in a particular case, [the court] must balance the defendant's constitutional right against the need to preserve the highest ethical standards of professional responsibility." *United States v. Cunningham,* 672 F.2d 1064, 1070 (2d Cir.1982). Canons 4 and 9 of the Code of Professional Responsibility [2] are particularly relevant. Canon 4 provides that "[a] lawyer should preserve the confidences and secrets of a client." "Ordinarily, an attorney may not knowingly reveal a confidence of a former client or use a confidence of his client to the disadvantage of the client." *Lagoven, S.A. v. Plaza Petroleum, Inc.,* 825 F.Supp. 481, 484 (E.D.N.Y. 1993) (Nickerson, J.). Canon 9 states "[a] lawyer should avoid even the appearance of professional impropriety."

The Government implicates both Canons by arguing that Schulman should be disqualified because the knowledge he learned as an AUSA in *Cambindo Valencia* constitutes privileged governmental material that would prejudice the Government if used at trial. Bermudez Prado implicates Canon 9, contending that Schulman should be disqualified because Schulman would be barred by Disciplinary Rule 9–101(B)(2) [3] from cross-exam-

---

**2.** "The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers.... They embody the general concepts from which ... the Disciplinary Rules are derived." *United States v. Brothers,* 856 F.Supp. 370, 374 n. 10 (M.D.Tenn.1992) (citing Model Code of Profes-

sional Responsibility, Preliminary Statement (1983)).

**3.** As compared to the Canons, "[t]he Disciplinary Rules ... are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." *Brothers,*

ining him if he takes the stand. This disciplinary rule provides:

> A lawyer having information that the lawyer knows is confidential government information about a person, acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which the lawyer is associated may knowingly undertake or continue representation in the matter only if the disqualified lawyer is effectively screened from any participation, direct or indirect, including discussion, in the matter and is apportioned no part of the fee therefrom.

Competing policy considerations are implicated when assessing these ethical precepts in the face of a motion to disqualify a former Government attorney. The Court does not want to "encourage Government attorneys to conduct their offices with an eye toward future private employment." *Ostrer*, 597 F.2d at 340. Yet, it would be unwise to discourage attorneys from seeking Government positions out of fear that any future in private practice would be unduly circumscribed because of the matters they worked on while with the Government. *See United States v. Brothers*, 856 F.Supp. 370, 375 (M.D.Tenn. 1992) ("Special considerations, both for and against disqualification, arise when a motion is interposed to disqualify a former government attorney."). The *Brothers* court thoroughly discussed these considerations:

> If service with the government will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in practice of the very specialty for which the government sought his service—and if that

sterilization will spread to the firm with which he becomes associated—the sacrifices of entering government service will be too great for most men to make. As for those men willing to make these sacrifices, not only will they and their firms suffer a restricted practice thereafter, but clients will find it difficult to obtain counsel, particularly in those specialties and suits dealing with the government.

> \* \* \* \* \* \*

On the other hand, policy considerations underlying DR 9–101(B) which militate towards disqualification include

> [t]he treachery of switching sides; the safeguarding of confidential governmental information from future use against the government; the need to discourage government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service; and the professional benefit derived from avoiding the appearance of evil.

*Id.* at 375 (citations omitted).

Because disqualification of a criminal defendant's chosen counsel seriously implicates the Sixth Amendment, "the government bears a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualification."[4] *United States v. Washington*, 797 F.2d 1461, 1465 (9th Cir.1986). *See In re Maritima Aragua, S.A.*, 847 F.Supp. 1177, 1180 (S.D.N.Y.1994) (Sweet, J.) ("Courts require parties seeking disqualification of counsel to meet a high standard of proof before disqualification may be granted."); *In re Del–Val Financial Corp. Sec. Litig.*, 158 F.R.D. 270, 273

---

856 F.Supp. at 374 n. 11 (citing Model Code of Professional Responsibility, Preliminary Statement (1983)).

**4.** The strength of the Sixth Amendment is such that it is problematic whether a criminal defendant must even show prejudice to obtain a new trial if his or her chosen counsel was erroneously disqualified. This remains an open question in the Supreme Court and the Second Circuit. *See Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) ("This

Court has never held that prejudice is a prerequisite to reversal of a judgment following erroneous disqualification of counsel in either criminal or civil cases. As in *Flanagan [v. United States*, 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984) ], we need not today decide this question."). *But see United States v. Washington*, 797 F.2d 1461, 1467 (9th Cir.1986) (ruling that an erroneous disqualification "is reversible error regardless whether prejudice is shown").

(S.D.N.Y.1994) (Conner, J.) ("[D]isqualification is a case-by-case determination, and the moving party bears a heavy burden of proving facts showing that disqualification is warranted."). Thus, disqualification motions are generally viewed with disfavor. *See Locascio,* 6 F.3d at 935 ("[D]isqualification is a drastic measure, [and] the district court is in the best position to evaluate what is needed to ensure a fair trial."); *In re Maritima Aragua, S.A.,* 847 F.Supp. at 1179 ("[T]he principle reason for [the disfavor] is that disqualification of counsel impinges on parties' rights to employ the counsel of their choice."); *Ullrich v. Hearst Corp.,* 809 F.Supp. 229, 236 (S.D.N.Y.1992) (Leval, J.) ("The Court of Appeals [for the Second Circuit] has cautioned that motions to disqualify counsel ... can inflict serious harm on the party whose lawyer is disqualified ... 'for in disqualification matters we must be solicitous of a client's right freely to choose his counsel'") (quoting *Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791 (2d Cir.1983)).

### B. *Resolution of the Competing Interests*

■ In *Ostrer,* the Government successfully moved the district court to disqualify a criminal defense attorney because of his prior contact while a federal prosecutor with three potential government witnesses. 597 F.2d 337. In affirming the disqualification, the Second Circuit discussed the import of the competing interests, but did not fashion a specific test to be implemented in future cases. Four years later, in *Evans,* a civil case involving a corporate defendant's motion to disqualify plaintiff's counsel based on counsel's prior representation of the defendant, the Second Circuit articulated a three-prong test to ensure faithful adherence to the code of professional responsibility and uphold the integrity of the adversary system. Under this test a court has the discretion to disqualify an attorney if:

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues of the present law suit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have access to, relevant privileged information in the course of his prior representation of the client.

*Evans,* 715 F.2d at 791. Since *Evans* was a civil case, however, the court did not consider the Sixth Amendment in formulating this test. Nevertheless, in *United States v. DiTommaso,* 817 F.2d 201, 219 (2d Cir.1987), the Second Circuit subsequently embraced this same three-prong test when faced with a motion to disqualify a criminal defense attorney.

In *DiTommaso,* defendant Messina successfully moved to disqualify his codefendant DiTommaso's attorney because of his prior representation of Messina in an unrelated criminal case. On appeal, the Second Circuit affirmed after employing the three-prong test. The court found that during his representation of Messina the attorney "was likely to have had access to privileged information potentially relevant to the present case." *Id.* at 220. Without discussing the content of that privileged information, or how it possibly could be used at trial, the court acknowledged the import of the Sixth Amendment, but nevertheless held that it was reasonable for the district court to disqualify the attorney so as to avoid conferring an "unfair advantage on DiTommaso ... or adversely affect[ing] Messina's interests." *Id.*

#### 1. *The Government's Motion*

The Second Circuit has yet to be called upon to apply the test where a former AUSA represents a criminal defendant he had prosecuted. Because of the special status and responsibilities of United States prosecutors, *see, e.g., Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1568, 131 L.Ed.2d 490 (1995) (stating that a prosecutor is "the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done") (citation omitted), the test should here be applied with particular sensitivity to the ethical considerations articulated in *Brothers,* 856 F.Supp. at 375, for disqualification of a prior government attorney, as mea-

sured against the ubiquitous Sixth Amendment interests of the criminal defendant.

After careful balancing of the competing interests at stake, within the framework of the test, the Court is compelled to uphold Escobar–Orejuela's Sixth Amendment entitlement, notwithstanding the heightened sensitivity which should be accorded to the ethical considerations favoring disqualification by reason of Schulman's former status as a United States prosecutor.

Although the first part of the test is obviously met, the Government has failed under the second and third prongs to establish that there is either a *substantial* relationship between the subject matter of *Cambindo Valencia* and the issues in the present prosecution, or that during Schulman's tenure as an AUSA he had access, or was likely to have access, to relevant privileged information. *See DiTommaso*, 817 F.2d at 219; *Evans*, 715 F.2d at 791 (emphasis added).

The indictment in *Cambindo Valencia* charged 27 defendants for their alleged participation in a wide-scale conspiracy to import and distribute drugs from 1972 through 1976. 609 F.2d at 606–07. Here, the Government has indicted three of those defendants—two of whom it is currently prosecuting and the other who has already pled guilty—for their alleged conduct during 1994 and 1995, in an alleged drug conspiracy headed by Escobar–Orejuela that is unrelated to the organization in *Cambindo Valencia* and arises out of a different investigation.

As thoroughly adduced at the Hearing, the Government's claim of substantial relationship only relates to background information the Government wishes to adduce at trial. It is true, as the Government contends, that the Second Circuit has endorsed the use of prior narcotics dealings as background to outline to the jury the particulars of a charged conspiracy. *See United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir.1992) ("Our decisions specifically approve the use of evidence of a defendant's prior narcotics dealings to delineate the background details of a conspiracy— to inform the jury of the background of the conspiracy charge, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.") (quotations omitted). *See also United States v. Alli–Balogun*, 72 F.3d 9, 11 (2d Cir.1995) (allowing a cooperating witness to testify as background "that [defendant] introduced him to heroin trafficking and [to explain] how the conspirators came to be involved with each other"). Nevertheless, the trial court retains broad discretion in determining whether to admit or exclude such evidence. *See United States v. Rosa*, 11 F.3d 315, 333–34 (2d Cir. 1993) ("We have held repeatedly that it is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators."), *cert. denied*, — U.S. ——, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994).

The potential use of this type of background evidence is insufficient to justify denying Escobar–Orejuela's constitutional right to counsel of his choice. *See Lagoven, S.A.*, 825 F.Supp. at 484 ("[D]isqualification has been granted or approved recently only when the issues involved have been *identical* or *essentially the same.*") (emphasis added; quotations omitted). The substantial hiatus between the two prosecutions, which as stated arose out of unrelated investigations, minimizes the likelihood that Schulman has, or is likely to have, privileged government information that could now be of use. Indeed, the Government has conceded that, although it had reviewed the *Cambindo Valencia* files, it could not isolate any material that would constitute relevant confidential information.

With respect to the prior relationship between Escobar–Orejuela, Lozada–Duenas and Bermudez Prado, the Government stated at the Hearing that it "was formed and investigated and *proved at trial* by Mr. Schulman" (Tr. 12) (emphasis added), thus rendering it public knowledge. The Government, therefore, cannot plausibly now contend that the nature of the relationship is confidential information. Furthermore, in its 40–page decision, the Second Circuit painstakingly analyzed the relationships between the various defendants in the *Cambindo Valencia* con-

spiracy without mentioning any relationship between Escobar–Orejuela, Lozada–Duenas and Bermudez Prado.

The Government's reliance on *Ostrer* is misplaced. The attorney in *Ostrer*—Pollack—while employed by the Department of Justice, separately prosecuted two individuals—Barresi and Geller—and had called a third individual, Brown, to testify against Geller at his trial. Pollack's prosecution of Barresi arose from his alleged extortionate activities as an officer of the same union from which Ostrer was charged with embezzling millions of dollars. Pollack prosecuted Geller for income tax evasion in connection with his check-cashing business, and Brown, who had sold one of his check-cashing establishments to Geller, was called by the Government to testify at trial. After Geller's trial, Pollack became privy to documents seized from Geller's and Brown's businesses.

The Government in *Ostrer* proffered that it would call all three individuals to testify at trial, and that both Geller and Brown would testify concerning transactions they each had with Ostrer in connection with their respective check-cashing operations. These transactions, the Government argued, supported its claim that Ostrer tried to avoid paying income tax by using imaginary entities and fictitious names to conceal his financial status. The Second Circuit held that the district court did not abuse its discretion by disqualifying Pollack "[b]ecause Brown and Geller will testify regarding matters with which Pollack became *uniquely* familiar while in Government service." *Id.* at 341 (emphasis added).

Here, the Government's proffer falls short of the representations made in *Ostrer*. There has been no showing that Schulman became "uniquely" familiar with confidential matters that could be used in this trial. In addition, in *Ostrer* "the Government's case rest[ed] to a large extent upon the testimony of Geller and Brown," *id.* at 340, and the proof that the Government intended to adduce through these witnesses involved documents and evidence that Pollack had access to while with the Government. In contrast, here the Government has proffered that Lozada–Duenas will testify about background information, and it does not contend that Schulman has obtained confidential information regarding any direct evidence it will adduce at trial. Furthermore, the Government's case does not rest upon this background information. As it stated at the Hearing: "[T]here are a substantial number of wiretap tapes and consensual tapes in this case which will be … some of the best evidence." (Tr. 14.)

Aside from *Ostrer*, there are only a handful of published decisions concerning motions to disqualify a criminal defendant's attorney because of counsel's prior Government employment. Unlike Schulman, in all the reported cases where counsel was disqualified, the former government attorney had some involvement with the investigation of the underlying prosecution. *See United States v. Miller*, 624 F.2d 1198, 1199 (3d Cir.1980) (affirming the "district court[s] disqualif[ication of a law] firm because one of its partners had been an assistant United States attorney … while the case was under investigation in the U.S. Attorney's office."); *United States v. Uzzi*, 549 F.Supp. 979, 982 (S.D.N.Y.1982) ("There is no question that this case is substantially related to the investigation with which [the attorney] had contact when he was an Assistant United States attorney; this prosecution arose directly out of that investigation."); *Brothers*, 856 F.Supp. 370 (disqualifying attorney who was a former Assistant United States attorney responsible for the issuance of a search warrant and seizure warrant during the underlying investigation). *Cf. Washington*, 797 F.2d at 1466 ("We have grave doubts whether an appearance of impropriety would ever create a sufficiently serious threat to public confidence in the integrity of the judicial process to justify overriding Sixth Amendment rights.").

### 2. Bermudez Prado

The three-prong test is not directly applicable to Bermudez Prado since he was never Schulman's client and it is the Government's, and not his, privileged material at issue. *See Cunningham*, 672 F.2d at 1072 ("No case has been called to our attention, and we are aware of none, in which an attorney has been disqualified on grounds of conflicting prior

representation solely at the behest of a person other than the former client or its privy."). Thus, he cannot satisfy the first prong of the test. In any event, as stated with respect to the Government's motion, the second and third prongs of the test have also not been met.

Failure to satisfy the test, however, should not be deemed preclusive if abject violence to the Disciplinary Rules would result if disqualification is not ordered. Disciplinary Rule 9–101(B)(2), however, does not here provide a separate basis for Bermudez Prado to obtain Schulman's disqualification. As stated, this rule prohibits an attorney from representing a private client where the attorney *knowingly* has confidential government information about a person that could be used to that person's material disadvantage. Such is not the present case.

### IV.

### CONCLUSION

Accordingly, the motion is DENIED.

SO ORDERED.